ATTORNEY FOR APPELLANT
Marce Gonzalez, Jr.
Dyer, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

## In the
## Indiana Supreme Court

**FILED**

Jul 31 2012, 1:25 pm

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 45S00-1102-LW-110

ENGELICA E. CASTILLO,             *Appellant (Defendant below),*

v.

STATE OF INDIANA,             *Appellee (Plaintiff below).*

Appeal from the Lake Superior Court, No. 45G04-0906-MR-5
The Honorable Thomas Stefaniak, Jr., Judge

**July 31, 2012**

**Dickson, Chief Justice.**

Prosecuted for the heinous death of Jada Justice, her two-year-old cousin, Engelica Castillo[1] was convicted of one count of Murder, two counts of class A felony Neglect of a Dependent, one count of class A felony Battery, and one count of class A misdemeanor False Informing. She was sentenced to life imprisonment without the possibility of parole for Murder plus a total of five additional years for the other crimes. On direct appeal, she challenges her sentence of life without parole for Murder, asserting two claims: (1) sentence inappropriateness and (2) prosecutorial misconduct during the sentencing phase of her trial. For reasons expressed below, we con-

---

[1] Castillo was eighteen years old at the time of the crime and twenty years old at the time of her sentencing.

clude that the appropriate sentence for this defendant's conviction for Murder is a term of sixty-five (65) years.

The dead body of two-year-old Jada Justice was recovered from a swampy body of water near LaPorte, Indiana, on June 24, 2009. At the time of her death, Jada was staying with her mother's first cousin, Engelica Castillo, and Castillo's then-boyfriend, Timothy J. Tkachik. According to the testimony of Castillo and of Tkachik, Jada died on June 13, 2009, while riding in Tkachik's vehicle or shortly thereafter. The exact cause of death was disputed at trial. Additional facts will be supplied as necessary.

On June 26, 2009, the State charged the defendant and Tkachik each with (1) Murder, a felony under Indiana Code Section 35-42-1-1, (2) two counts of Neglect of a Dependent as a class A felony under Indiana Code Section 35-46-1-4, (3) Battery as a class A felony under Indiana Code Section 35-42-2-1, and (4) False Informing as a class A misdemeanor under Indiana Code Section 35-44-2-2. On September 18, 2009, the State amended the charges against the defendant, reducing the Battery count to a class D felony and requesting that a sentence of life without the possibility of parole be imposed on the defendant for the Murder charge based on the fact that the victim was less than 12 years of age at the time of her death.[2] Tkachik entered into a plea agreement with the State on June 21, 2010, whereby he pled guilty to two counts of class A felony Neglect of a Dependent and agreed to cooperate in the defendant's prosecution and testify against her at trial. In exchange, the State agreed to dismiss the counts charging Tkachik with Murder, class A felony Battery, and False Informing and agreed to request a sentence of no more than 50 years for each count with any sentences to be served concurrently.[3] The defendant, Castillo, was tried before a jury and found guilty on all counts. At the sentencing phase of her trial, the jury recommended a sentence of life without the possibility of parole. Accordingly, the trial court sentenced the defendant to the Indiana Department of Corrections for life without the possibility of parole for the count of Murder, for an additional two years for each count of Neglect

_____

[2] A sentence of life without the possibility of parole can only be sought for murder where the State identifies the existence of at least one statutorily defined aggravating circumstance. Ind. Code § 35-50-2-9(a). One such aggravating circumstance is that "The victim of the murder was less than twelve (12) years of age." *Id.* § 35-50-2-9(b)(12).

[3] As of the date of Castillo's sentencing, Tkachik had not yet been sentenced.

of a Dependent, and for an additional one year for the count of False Informing.  The count of Battery was vacated.  All sentences were ordered to be served consecutively.  The defendant then filed this direct appeal on October 12, 2010.[4]

## 1. Appropriateness of Life without the Possibility of Parole

The defendant first contends that her sentence for Murder—life imprisonment without the possibility of parole—is inappropriate in light of the maximum possible sentence—fifty-years' imprisonment—faced by her codefendant, Tkachik, as a result of his plea agreement.

The Indiana Constitution grants this Court "in all appeals of criminal cases, the power to review all questions of law and to review and revise the sentence imposed."  Ind. Const. art. 7, § 4.  We may exercise this power even where the trial court has acted within its lawful discretion.[5]  Buchanan v. State, 767 N.E.2d 967, 972 (Ind. 2002).  This power "reserv[es] for the appellate court the chance to review the matter in a climate more distant from local clamor."  Serino v.

---

[4] Pursuant to Indiana Appellate Rule 4(A)(1)(a), we have "mandatory and exclusive jurisdiction" over "Criminal Appeals in which a sentence of death or life imprisonment without parole is imposed under Ind.Code § 35-50-2-9. . . ."

[5] The independent nature of the review and revise power granted by Article 7, Section 4, is apparent from the legislative history of the provision:

> The framers of the constitutional reform of which section 4 was a part provided explicitly for reference to certain historical materials in interpreting its meaning: "The report of the Judicial Study Commission and the comments to the article contained therein may be consulted by the Court of Justice to determine the underlying reasons, purposes, and policies of this article and may be used as a guide in its construction and application."  Ind. Const. art. VII, Schedule (Burns 1978 Ed.).  The Commission's report describes the origin and scope of the power to review and revise sentences contained in section 4: "The proposal that the appellate power in criminal cases include the power to review sentences is based on the efficacious use to which that power has been put by the Court of Criminal Appeals in England."  Report of the Judicial Study Commission 140 (1967).  The English statute establishing the Court of Criminal Appeals set forth that court's power to review and revise sentences as follows:
>> On appeal against sentence the Court of Criminal Appeal shall, if they think that a different sentence should have been passed, quash the sentence passed at the trial, and pass such other sentence warranted in law by the verdict (whether more or less severe) in substitution therefor [sic] as they think ought to have been passed, and in any other case shall dismiss the appeal.
> Criminal Appeal Act, 1907, 7 Edward 7, ch. 23, § 4(3).

Cooper v. State, 540 N.E.2d 1216, 1218 (Ind. 1989).  For a further explication of the history of Article 7, Section 4, in relation to the criminal law and procedure of England, see McCullough v. State, 900 N.E.2d 745, 747–50 (Ind. 2009).

State, 798 N.E.2d 852, 856–57 (Ind. 2003). We have chosen to implement this constitutional power using Indiana Appellate Rule 7(B). Childress v. State, 848 N.E.2d 1073, 1079 (Ind. 2006); Buchanan, 767 N.E.2d at 972–73. This rule provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B).

It is the nature of the offense, not the character of the defendant, which provides the strongest consideration in favor of revising the defendant's sentence in this case. At trial, the jury was only presented with two possible grounds on which it could convict the defendant of Murder: (1) that the defendant knowingly or intentionally killed the victim or (2) that the defendant aided, induced, or caused the commission of Murder by another, namely the defendant's boyfriend.[6] Of these two alternative grounds, we find that the evidence was insufficient for a reasonable jury to conclude that the defendant knowingly or intentionally killed the victim but that it was sufficient for the jury to find her guilty as an accomplice.[7]

With respect to the nature of the crime, the evidence most favorable to the defendant's sentence reveals the following: At the time of the events leading to this case, the victim was staying with the defendant and the defendant's boyfriend at their home. The victim was scheduled to stay there from June 8 through June 21 of 2009. The first few days of the victim's visit were rel-

---

[6] Another basis for liability was potentially implicated by the fact that the defendant and her boyfriend failed to seek professional medical assistance for the victim when they realized she had stopped breathing. Under Indiana Code Section 35-41-2-1(a), a person can commit an offense by failing to act "only if [s]he has a statutory, common law, or contractual duty to perform the act." In this case, no evidence of any such affirmative duty was offered, nor was such a duty alleged in the charging information, nor was any such duty included in the jury instructions. Therefore, the defendant's failure to act could not have been the basis of the jury's verdict. Even if this basis for liability had been properly before the jury, we would still conclude that the defendant's Murder conviction should be reduced from life without the possibility of parole to a term of years in light of the undisputed evidence that the defendant attempted to administer CPR to the victim. While these attempts to help are not heroic, they weigh heavily against a conclusion that the defendant's actions exhibited a degree of depravity sufficient to warrant a sentence of life without parole.

[7] Where the sufficiency of the evidence is at issue, the question is whether "there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." Bailey v. State, 907 N.E.2d 1003, 1005 (Ind. 2009). We consider only the evidence favorable to the conviction and any reasonable inferences that can be drawn therefrom. Id. We do not reweigh the evidence nor judge the credibility of witnesses. Id.

4

atively unremarkable. On the morning of June 12, the defendant and her boyfriend discovered that the victim had taken a packet of powdered Hawaiian Punch mix and strawberries out of their refrigerator without asking their permission. The defendant responded by yelling at and spanking the victim and then wrapping twine around the refrigerator later in the day. The defendant's boyfriend, who was present during nearly all of the events in question, testified that the rest of that day was uneventful. The next morning, on June 13, the defendant discovered that the victim had locked herself in her bedroom. After unlocking the door, the defendant found that the victim had made a mess on the bedroom floor with syrup and powdered Hawaiian Punch packets that the victim had found in the kitchen. Again, the defendant yelled at and spanked the victim and then cleaned up the mess, pushing the victim aside roughly as she cleaned.

Later in the day, around lunchtime, the defendant gave the victim a pre-packaged lunch to eat. The victim did not eat much of it, mostly playing with the food and throwing pieces of it to the dog. This made the defendant angry. As punishment, the defendant put the victim in a corner in the victim's bedroom and then, after cleaning the mess in the kitchen, sat on the couch with her boyfriend in the living room. The defendant could see the victim in her bedroom from the couch and, soon after sitting, noticed that the victim was no longer standing but instead sitting down in the corner and playing with toys. The defendant then returned to the bedroom, spanked the victim, and attempted to force her to stand upright by yanking her and holding her upright by her arms. The defendant then went back to the living room and again sat on the couch. Approximately five minutes later, the defendant again became irritated with the victim and returned to the bedroom. The facts are not clear as to what exactly occurred during this confrontation, but the defendant's boyfriend testified that he could hear the defendant speaking in an irritated tone to the victim when the door was closed and that, at one point when the door was open, he saw the defendant holding the victim by the hair, poking her in the body, and slapping her. At one point during this confrontation, the defendant brought the victim into the living room and, with her boyfriend's help, spanked the victim several times on her bare bottom using a belt. Approximately one and one-half hours after this confrontation began, the defendant came out of the victim's bedroom and told her boyfriend that the victim had hit her head on a table in the bedroom when the defendant had slapped her. The boyfriend testified that the victim sustained a small cut above her right eye that bled only a small amount and that the defendant put a small

5

bandage over it. He also testified that he noticed red marks on the victim's face and bruises on her buttocks around that same time.

Shortly after the victim hit her head, the defendant's boyfriend became frustrated by the ongoing confrontation between the victim and the defendant. He ran into the victim's bedroom and "knuckled" the victim in the head "pretty hard" four to six times "hoping that everything would stop after that." Tr. at 334–35. Afterward, the defendant continued to hold the victim by the hair, yanking and pushing her, and eventually tied the victim to a chair with her boyfriend's belts. She initially placed one belt around the victim's waist and another around her neck but removed the belt from around the victim's neck after her boyfriend told her to do so. Still frustrated with the situation, the defendant's boyfriend then went to the gas station. When he arrived home, he heard "boom, boom, boom, boom" coming from the victim's bedroom, but he couldn't see what was causing the noise because the bedroom door was shut. Tr. at 341. He then made plans to go to Chicago that evening to purchase heroin.

Approximately thirty minutes later, the defendant and her boyfriend left for Chicago to retrieve the heroin. The boyfriend testified that, while they were getting the victim ready to leave, he noticed that the victim had a bruise on her face, that she seemed "out of it," and that she was unable to hold her bottle while sitting in her carseat. Tr. at 344. The defendant wrapped the victim in a blanket to hide the marks on her body because they were going to take a friend with them to Chicago. Shortly after leaving the house, while driving on Interstate 94, the boyfriend noticed that the victim's head was leaning down towards her chest with her eyes closed. He then jumped in the back seat, found that she was not breathing, and attempted to administer CPR as the defendant pulled off the road. At that point, the defendant and her boyfriend switched places, and the defendant continued CPR while her boyfriend drove the truck back to their house. Once they arrived home, they stopped administering CPR and left the victim in the backseat of the truck covered with a tarp. Sometime later, they set off for Chicago again, without the victim. The precise timing of the victim's death is unclear, but both the defendant and her boyfriend testified that she was dead when they returned from Chicago later that night.

6

To be convicted of Murder as the principal, the defendant must knowingly or intentionally kill another person. Ind. Code § 35-42-1-1. There must be evidence either that it was the defendant's "conscious objective" to kill the victim, Burkhalter v. State, 272 Ind. 282, 285, 397 N.E.2d 596, 598 (1979); *see also* Ind. Code § 35-41-2-2(a) ("A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so."), or that the defendant was aware of a high probability that his or her actions would result in the death of the victim, Young v. State, 761 N.E.2d 387, 389 (Ind. 2002); Burkhalter, 272 Ind. at 285, 397 N.E.2d at 598; *see also* Ind. Code § 35-41-2-2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so.").

As noted above, these facts do not support a conviction of the defendant for Murder as a principal but only as an accomplice. Notwithstanding the defendant's terrible treatment of the child, none of her actions were causally linked to either cause of death offered to explain the victim's death at trial. Here, the evidence shows only that the defendant (1) *yelled* at the victim repeatedly, (2) *spanked* the victim *with and without a belt* several different times, (3) *slapped* the victim, (4) *poked* the victim, (5) *shoved* and *pushed* the victim, and (6) *yanked* the victim by the hair and arms. As an initial matter, we note that none of these actions, on their face, evince a conscious objective to kill the victim nor are any of these actions in isolation associated with a high probability of death. It is presumably possible that in the aggregate a physical battering of a child similar to that which occurred in this case *could* cause the death of a small child. However, there was no evidence to support such an inference in this case. Neither of the medical experts who testified to the cause of death contended that the victim's death was caused by or could have been caused by the yelling, spanking, slapping, poking, shoving, pushing, or yanking of the body and hair inflicted by the defendant. The doctor who performed the autopsy testified that the sole cause of death was blunt force injuries of the head with the depressed skull fracture being the primary injury. The defendant's medical expert testified that the cause of death was asphyxiation caused by unconsciousness leading to an obstructed airway or some other interference with the child's breathing. Yet, we cannot conclude that any of the defendant's actions—yelling, spanking, slapping, poking, shoving, pushing, and yanking—would make a person aware, either in isolation or in the aggregate, of a high probability of death from blunt force injury of the head or asphyxiation.

7

The only injury to the victim caused by the defendant's actions that was identified as a potential cause of the victim's death was the fact that the victim hit her head on a table after being slapped by the defendant. The autopsy doctor testified that falling on the distinct edge of an object could cause a blunt force head injury sufficient to have killed the victim in this case. There was no evidence, however, that the defendant intentionally or knowingly caused the victim to hit her head on the table. The evidence only suggested that the injury was an accident. The speculative connection between the slap and the victim striking her head on the table is not substantial evidence of probative value proving that, in administering such slap, the defendant should have been aware of a high probability of resulting death.

To be convicted of Murder as an accomplice, the defendant must knowingly or intentionally aid, induce, or cause the commission of a murder by another. Ind. Code § 35-41-2-4. A defendant may be charged as the principal but convicted as an accomplice. Jester v. State, 724 N.E.2d 235, 241 (Ind. 2000); Wise v. State, 719 N.E.2d 1192, 1198 (Ind. 1999). Generally there is no distinction between the criminal liability of an accomplice and a principal, Wise, 719 N.E.2d at 1198, although evidence that the defendant participated in every element of the underlying offense is not necessary to convict a defendant as an accomplice. Vitek v. State, 750 N.E.2d 346, 352 (Ind. 2001). "There is no bright line rule in determining accomplice liability; the particular facts and circumstances of each case determine whether a person was an accomplice." *Id.* at 353. We consider four factors to determine whether a defendant acted as an accomplice: (1) presence at the scene of the crime; (2) companionship with another at scene of crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after occurrence of crime. *Id.* at 352. That a defendant was present during the commission of a crime and failed to oppose the crime is not sufficient to convict her. *Id.* But, "presence at and acquiescence to a crime, along with other facts and circumstances" may be considered. *Id.* at 352–53.

In this case, there was sufficient evidence presented at trial from which the jury could have concluded beyond a reasonable doubt that the defendant's boyfriend murdered the victim. The defendant's boyfriend, Tkachik, admitted to abusing the victim on the day of her death, say-

8

ing that he "knuckled" the victim in the head "pretty hard" four to seven times.  Tr. at 334–35.  From this, the jury could reasonably have concluded that the defendant's boyfriend was aware of a high probability that punching a child in the head could kill the child.  The evidence most favorable to a conviction based on accomplice liability demonstrates that the defendant was present when her boyfriend punched the victim in the head, that she did not object to his actions, and that she continued to associate with him in an amicable manner after the incident.  More importantly, the defendant attempted to conceal the victim's injuries in preparation for the trip to Chicago and failed to insist on or seek professional medical treatment for the victim at any time.  Additionally, after the victim's death, the defendant assisted her boyfriend in disposing of the child's body and staged a fake abduction at a nearby gas station in an attempt to provide a cover story to explain the victim's disappearance.  In light of this evidence, we have little trouble concluding that there was sufficient evidence for a jury to conclude that the defendant aided another in the commission of a murder.

Nevertheless, as we have acknowledged, "[w]hile an accomplice may be found guilty of the crime largely executed by his principal, it does not follow that the same penalty is appropriate." Martinez Chavez v. State, 534 N.E.2d 731, 735 (Ind. 1989).  We believe this sentence of life without the possibility of parole is inappropriate under the circumstances of this case, particularly given that the defendant was merely complicit in her boyfriend's conduct but did not actively participate in or plan the killing.  We have accorded a similar degree of leniency to defendants whose role in a murder was substantially less blameworthy than the principal's, reducing the length of the defendant's sentence. *See, e.g.*, Baxter v. State, 727 N.E.2d 429, 436–37 (Ind. 2000) (revising 65-year sentence of defendant convicted of Murder as accomplice to 55 years because of defendant's good character and because defendant did not expect "at the outset of the evening that his association with [the principals] would result in any crime"); Edgecomb v. State, 673 N.E.2d 1185, 1199–1200 (Ind. 1996) (revising defendant's 60-year sentence to 40 years in part because defendant did not encourage the murder, was not present during the murder, and did not actually kill the victim).

In this case, the evidence most favorable to conviction makes clear that the defendant's role in causing the fatal injuries was indirect.  Without a doubt, the physical battering inflicted by

the defendant was excessive and unacceptable, yet, as discussed above, none the acts of physical abuse inflicted by the defendant are associated with a high probability of death. These circumstances lead us to conclude that for this defendant a sentence to a term of years is more appropriate than a sentence of life imprisonment without the possibility of parole.[8] That the defendant continued to physically discipline the victim after she was punched in the head by Tkachik, that the defendant seemingly showed no concern for the victim's well-being prior to the time when she stopped breathing, and that the defendant attempted to conceal the victim's death and did not assist law enforcement with the investigation reflect negatively on the defendant's character and militate in favor of a sentence above the advisory sentence for Murder.[9] Weighing all of these circumstances together, we conclude that the appropriate sentence for this defendant is the maximum term of years for Murder—sixty-five (65) years.

## 2. Prosecutorial Misconduct

The defendant also challenges her sentence of life without parole on the ground that the trial prosecutor engaged in prosecutorial misconduct at the penalty phase of her trial and that these actions constituted fundamental error. She focuses upon the following statements made by the prosecutor during closing arguments at the penalty phase of the trial:

> We are here because of that little girl and do not compare what you're evaluating, the aggravating factor and these mitigating factors that the defense has brought. Do not compare Engelica Castillo's pathetic miserable childhood to the life of that two-year old. Her own family didn't want her. The Courts couldn't deal with her. Everything that they said—I mean, she's a problem. She is a problem. She is uncontrollable . . . . She never deserves to be out . . . . As sad an tragic as it may be, it has turned her into a violent, vicious, manipulative—you saw her behavior, she is not mild and meek. She is defiant. She runs away, she stands up for herself. She's a fighter. . . . Suspensions for fighting, for pushing. For pushing a student into a table. 2002, its in here, punching a student. . . . That is who she is, what you saw is who she is.
>
> She pleads for your mercy to give her some sort of life should she get out. I ask you to give her and show her that same mercy that she showed that two year old. She beat her with a belt because that's how she grew up, because that's what she knows, you

---

[8] Our conclusion here should not be construed as a general prohibition on the imposition of a sentence of life without parole where the defendant is only convicted as an accomplice to murder. Each case must be reviewed in light of the unique set of circumstances underlying conviction.

[9] Indiana Code Section 35-50-2-3 establishes the sentencing range for Murder as a term between forty-five (45) and sixty-five (65) years with an advisory sentence of 55 years. Ind. Code § 35-50-2-3(a).

10

are a product of your environment. She's not this little innocent shrinking violet, "Woe is me, everybody's against me." She is an abuser, she is violent. She is vicious. . . .

. . . Because of her, Jada Justice will never go to school, ride a bike, get a driver's license, have a first kiss, go to the prom, graduate, put on a wedding dress—never. Because of her actions and her behavior and the way she is. All that is gone. She is broken. She has been broken since she was a kid and there is no fixing her.

Tr. at 1856–59. The defendant contends that these statements urged the jury not to compare the aggravating and mitigating circumstances in deciding whether to impose a sentence of life without parole contrary to Indiana law and encouraged the jury to impose such sentence based upon the defendant's alleged unsavory character. The defendant did not object to these statements at trial and thus challenges them in this appeal as fundamental error.

We evaluate a properly preserved claim of prosecutorial misconduct using a two-step analysis. We first determine whether misconduct occurred, then, if there was misconduct, we assess "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). To preserve a claim of prosecutorial misconduct, the defendant must ask the trial court, at the time the misconduct occurs, to admonish the jury or move for a mistrial if admonishment is inadequate. *Id.* Failure to request an admonishment or a mistrial waives the claim, unless the defendant can demonstrate that the misconduct rises to the level of fundamental error. *Id.* Fundamental error is a narrow exception intended to place a heavy burden on the defendant. It requires the defendant to establish that the misconduct "[made] a fair trial impossible or constitute[ed] clearly blatant violations of basic and elementary principles of due process" or that the misconduct "present[ed] an undeniable and substantial potential for harm." Benson v. State, 762 N.E.2d 748, 756 (Ind. 2002); *accord* Cooper, 854 N.E.2d at 835.

The prosecutor, during closing arguments at the sentencing phase of trial, actually told the jury not to compare the mitigating and aggravating factors. Tr. at 1856–57 ("[D]o not compare what you're evaluating, the aggravating factor and these mitigating factors that the defense has brought. Do not compare Engelica Castillo's pathetic miserable childhood to the life of that two-year old.") Yet, Indiana law expressly requires the jury to make such a comparison before imposing a sentence of life without parole. Ind. Code § 35-50-2-9(l) ("Before a sentence may be

11

imposed under this section, the jury . . . must find that: . . . any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances."). Under the Rules of Professional Conduct, which are one means by which we assess the appropriateness of a prosecutor's conduct, *see* Swope v. State, 263 Ind. 148, 155, 325 N.E.2d 193, 196 (1975) (evaluating prosecutor's alleged misconduct with reference to the then-in-force Code of Professional Responsibility and finding no misconduct); *see also* Cooper, 854 N.E.2d at 835 ("Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct."), a prosecutor has a duty to truthfully represent the law and facts of a case to the jury. Ind. Professional Conduct Rule 3.3(a)(1) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal . . . .").[10] We believe that the prosecutor's misstatement constituted misconduct because the prosecutor urged the jury to act contrary to law.

In addition to misstating the law on sentencing, the prosecutor repeatedly implored the jury to consider the defendant's unsavory character, specifically:

> The Courts couldn't deal with her. . . . I mean, she's a problem. She is a problem. She is uncontrollable . . . she never should be out. She never deserves to be out in public. . . . As sad and tragic as it may be, it has turned her into a violent, vicious, manipulative— you saw her behavior, she is not mild and meek. She is defiant. . . . She's a fighter. . . . That is who she is, what you saw is who she is. What those papers tell you is who she is.
> . . . She's not this little innocent shrinking violet, "Woe is me, everybody's against me". She is an abuser, she is violent. She is vicious. . . .
> Do not give her the mercy she asks for now. She doesn't deserve it, and frankly, she doesn't deserve to be walking around in public at all. . . . She is broken. She has been broken since she was a kid and there is no fixing her.
> How many chances do you have to give someone? How many? Everyone has tried and it has failed. She is out of chances. . . .

Tr. at 1857–58. In its entirety, this colloquy on the defendant's character comprised nearly one-third of the prosecutor's closing statements to the jury. We have made clear in other cases that it is "misconduct for a prosecutor to request a jury to return a death penalty or life without parole recommendation for anything other than that the mitigating factors are outweighed by the aggravating factor or factors." Cooper, 854 N.E.2d at 841. And, under the statute, the only aggravating factor that the jury could consider in this case was that the victim was less than twelve years

---

[10] A tribunal is "a court, an arbitrator, or any other neutral body or neutral individual making a decision, based on evidence presented and the law applicable to that evidence, which decision is binding on the parties involved." Prof. Cond. R. 1.0(m).

of age at the time she was murdered. *See* Ind. Code § 35-50-2-9(b). None of the statutory factors include the character of the defendant. *See generally* Ind. Code § 35-50-2-3(b).

It could be contended that, standing alone, the prosecutor's erroneous statement of law would present little threat of prejudice because it was only a small part of a much longer exposition by the prosecutor in closing argument, was not repeatedly reiterated, and was countered by a correct statement of the law in the final instructions.[11] But, when it is juxtaposed with the prosecutor's thinly-veiled call for the jury to sentence the defendant to life without parole because of her unsavory character, we cannot ignore the substantial potential for harm to the defendant's right to be sentenced fairly in accordance with the law. Telling the jury not to balance the aggravators and the mitigators touched on the central task of the jury in deciding whether to impose life without parole. The prosecutor not only urged the jury not to so weigh the factors but also asked the jury to consider additional allegedly aggravating circumstances not permitted by the statute. Although the defendant's trial counsel did not contemporaneously object, the magnitude of this prosecutorial overreaching not only placed the defendant in a position of grave peril to which she should not have been subjected but also presented an undeniable and substantial potential for an erroneous jury sentencing recommendation. For her claim of prosecutorial misconduct in the penalty phase, the defendant asks that we vacate her life sentence and either "remand to impose a sentence of years, or imposition of a sentence of years by this Court." Appellant's Br. at 17. Because we have in Part 1 of this opinion concluded that the defendant's sentence for the crime of murder should be revised from life without parole to a term of sixty-five years, no further relief is warranted for the defendant's prosecutorial misconduct claim.

**Conclusion**

---

[11] As we explained recently, closing arguments are rightly received by the jury as partisan advocacy, not impartial statements of the law, and thus are likely to have little effect on the jury's understanding of the law. *See* LaPorte Cmty. Sch. Corp. v. Rosales, 963 N.E.2d 520, 526 (Ind. 2012) ("Thus, whether the closing argument of one of the lawyers may have been an attempt to clarify an instruction ambiguity, the jury would properly have received such statements as advocacy on behalf of the lawyer's client. Such closing arguments of counsel cannot provide us with any assurance that the jury understood the lawyer's statements to clarify, supersede, or countermand the instructions given by the trial judge.").

We conclude that the appropriate sentence for the defendant's murder conviction is imprisonment for a term of sixty-five (65) years rather than life imprisonment without the possibility of parole. This cause is remanded for entry of the revised sentence on the conviction for Murder.

Sullivan, J., concurs.

Rucker, J., concurs in result.

David, J., concurs in result with separate opinion.

Massa, J., dissents with separate opinion.

**David, J., concurring in result.**

The majority concludes that the "facts do not support a conviction of the defendant for Murder as a principal but only as an accomplice." Slip op. at 7. In essence, the majority believes that Castillo did not knowingly or intentionally kill her two-year-old cousin. Although I agree that the evidence does not support a finding that Castillo *intentionally* killed the victim, I believe that there was sufficient evidence for a jury to find that Castillo *knowingly* killed the victim.

The evidence showed that over the course of at least five hours, Castillo repeatedly beat the two-year-old victim in some way, shape, or form. The evidence further showed that Castillo told her boyfriend that the victim hit her head on a table after Castillo slapped the victim. The likely cause of death to the victim was blunt force trauma to the head. It was reasonable for the jury to infer that Castillo either (1) was aware that her slapping the victim in close proximity to the table could easily result in the victim hitting her head on the table or (2) was lying when she stated it was an accident that the victim hit her head on the table.

Furthermore, Castillo's boyfriend testified that after the table incident there was another incident that involved Castillo and the victim in the victim's bedroom. He testified that there were "boom, boom, boom, boom" noises coming from the bedroom, where Castillo had tied the victim to a chair. Slip op. at 6. Although he could not see what was causing the noises, he testified that thirty minutes later, he "noticed that the victim had a bruise on her face, that she seemed 'out of it,' and that she was unable to hold her bottle while sitting in her carseat." Slip op. at 6. It was reasonable for the jury to infer that (1) the noises were the result of Castillo beating the victim behind closed doors, given the victim's state shortly afterward and that (2) given everything that had already happened that day, Castillo was aware that additional beating would likely cause the death of a two-year-old.

Ultimately, I believe a jury could have properly found that Castillo, especially when her actions are viewed in the aggregate, was aware that her conduct would result in the death of her two-year-old cousin. A sentence revision should not be based on the nature of the offense, which was clearly heinous.

However, I do not object to revising the sentence to a term of sixty-five years for a host of other reasons: Castillo's difficult upbringing, her boyfriend's participation in the murder, the terms of the boyfriend's plea agreement, and the prosecutorial misconduct.

**Massa, J., dissenting.**

I agree with the majority's conclusion that the evidence supported Castillo's conviction for murder as an accomplice, but dissent because I believe there was also substantial evidence for the jury to conclude Castillo was the principal actor.

As the majority correctly states, a person may be convicted of murder where the evidence shows he or she "was aware of a high probability that his or her actions would result in the death of the victim." Slip op. at 7; accord Williams v. State, 749 N.E.2d 1139, 1141 (Ind. 2001). But I part ways where it "cannot conclude that any of the defendant's actions—yelling, spanking, slapping, poking, shoving, pushing, and yanking—would make a person aware, either in isolation or in the aggregate, of a high probability of death from blunt force injury of the head or asphyxiation." Slip op. at 7–8.

First, I do not think such a level of precision in formulating a defendant's intent to kill—that the defendant be aware of the particular manner and means of the fatal blow—is required by our case law. The evidence just had to show that Castillo was aware of a high probability that her actions would result in Jada's death—not death by hitting her head on a table. And in making this determination, "the jury may consider the duration and brutality of a defendant's actions, and the relative strengths and sizes of a defendant and victim." Williams, 749 N.E.2d at 1141. Intent to kill may also be inferred "where blows of magnitude are repeated," and "from the nature of the attack and the circumstances surrounding the crime." Nunn v. State, 601 N.E.2d 334, 339 (Ind. 1992).

Here, the evidence introduced at trial showed that Castillo brutally abused Jada over the course of a day, including numerous strikes to the face, pushing, and yanking on her hair, some of which occurred while Jada was restrained. The evidence also showed that Castillo sent Tkachik to the gas station to get duct tape and, upon his return, took that duct tape into the bedroom with Jada. Tkachik then testified to hearing several "boom" sounds coming from the

room.  It was after this ominous incident—at the end of a day of physical abuse—that Castillo and Tkachik put Jada in the car and noticed she was not breathing.

Were Jada an adult, perhaps this level of assault—while still heinous—might not raise an awareness of a high probability of death.  But Jada was *two years old*, and I struggle to believe that even an eighteen-year-old carrying out an attack of this scope was not aware that there was a high probability that it could end in death.  There was an enormous disparity in size and strength between Jada and Castillo, and this was a protracted and brutal assault with repeated blows of magnitude characterized by escalating viciousness toward a helpless two-year old child—and because of it, Jada died.  I believe this was sufficient to sustain Castillo's conviction for murder, regardless of Tkachik's conduct.[1]

As a result, I also disagree with the majority's decision to revise Castillo's sentence because it rests upon the conclusion that Castillo "was merely complicit in her boyfriend's conduct but did not actively participate in or plan the killing."  Slip op. at 9.  Even absent the evidence discussed above, Castillo herself says otherwise through her appeal.[2]  In fact, this concession is the very basis for her appeal of her sentence:  she received a sentence of life without the possibility of parole whereas Tkachik faced a sentencing range between twenty and fifty years.  Appellant's Br. at 11 ("This recognition reveals why the disproportionate sentences renders [sic] Castillo's life sentence inappropriate.").

---

[1] Accord Childers v. State, 719 N.E.2d 1227, 1230 (Ind. 1999) (finding evidence sufficient to sustain a murder conviction where the three-year-old victim was in the adult defendant's care, a witness heard the defendant spanking the victim and yelling, the defendant admitted putting the victim across his lap and whipping him, and the victim later died of a hematoma:  "Given the disparity in size and strength between the defendant and Wesley, and the number and severity of the wounds indicating the considerable force used in striking Wesley, a reasonable jury could have found, beyond a reasonable doubt, that the defendant was aware of a high probability that the blows he struck would result in Wesley's death.").

[2] "Castillo respectfully urges that her role in the death of the child *is equal to* or lesser than that of Tkachik."  Appellant's Br. at 10 (emphasis added).  "Hence, *both Castillo and Tkachik participated* in the events leading to the death of J.J. and it is very plausible that a detached, neutral appellate tribunal could reasonably conclude that *they were equally responsible* for the death of J.J."  Appellant's Br. at 11 (emphasis added).  "This rare case features *two defendants who are as equally culpable as one could imagine . . . .  Both defendants participated* in the same series of acts resulting the death of J.J."  Appellant's Br. at 13 (emphasis added).

In my view, however, while we *may* consider the difference between Castillo's sentence and Tkachik's sentence, we are under no obligation to do so. Appellate Rule 7(B) requires consideration only of the sentence, the nature of the offense, and the character of the offender. I do not believe this is a case for comparison between *co-defendants'* sentences because Tkachik's reduced sentencing range came only as a result of his agreement to plead guilty to lesser charges. In exchange for this, the State secured Tkachik's cooperation and testimony—both of which appear to have been necessary for Castillo's conviction.

This prosecutorial approach is not surprising, given that the only remaining, living witnesses to the entire course of conduct were Tkachik and Castillo. Thus, the only way for the State to prove who did what was to secure one defendant's testimony against the other, in exchange for a lighter sentence. This Court has just recently noted this technique is sometimes necessary to present "a relatively clear picture of an otherwise-muddy situation." Cain v. State, 955 N.E.2d 714, 719 (Ind. 2011) (affirming a sentence of life without the possibility of parole for one of four defendants tried separately for one murder when the case required the prosecutor to "seek plea agreements in which she sought lesser charges in exchange for the defendant's testimony."). Divide and conquer is a fundamental crime-solving strategy when more than one suspect is involved. When one blinks first and gets the benefit of his bargain, it does not render his co-defendant's fuller punishment disproportionate and should not serve as the basis for appellate revision. Our jurisprudence should not undermine acceptable stationhouse bargaining tactics.

Even taking the majority's view of culpability, I still believe a sentence of life without parole is not inappropriate on these facts. The jury found the sole charged aggravator—that the victim was under the age of twelve—beyond a reasonable doubt.[3] The jury also found that Castillo proved a number of mitigating factors—including her childhood experience, family situation, and drug use—but still believed the aggravator outweighed the mitigators. I see no

---

[3] It seems as though the defendant requested that the trial court judge make independent findings with respect to the aggravating and mitigating circumstances, as well as the sentence. I express no view as to the propriety or necessity of this added step, but point out only that the judge independently reached the same conclusion as the jury with respect to Castillo's sentence.

reason to disturb this decision under our Rule 7(B) analysis when considering the nature of the offense (a vicious litany of abuse on a defenseless and utterly innocent victim followed by a deliberate, planned attempt to conceal the crime, deny involvement, and deceive law enforcement) and the character of the offender (a drug-abusing teenager with a troubled childhood who exhibited hostility to authority and callous disregard for her victim and was hardly the manipulated accomplice she now claims to be).

Finally, with respect to Castillo's claim that the State's commentary during its closing arguments at her sentencing was improper, I concur with the majority's determination that there was misconduct. It was inappropriate for the prosecutor to imply that the jurors should not compare the aggravating and mitigating factors, or that they should impose a sentence based on anything other than those aggravating and mitigating factors.

That said, I do not believe this misconduct rises to the level of fundamental error. Much of Castillo's strategy at sentencing appears to have been aimed at creating an impression in the minds of the jurors that she was a product of her broken childhood and the manipulative mind of Tkachik. The State's response would necessarily have been to try to decrease the weight the jury afforded this impression, and that is how I interpret most of the commentary cited by the majority. While some of it is inappropriate, in my view much of it is directly aimed at diminishing the credibility of Castillo's mitigating factors. This was not an inappropriate stratagem for the State to employ. Moreover, as the majority says, the correct law was provided in the final instructions, and in the absence of contrary evidence we presume the jury follows those instructions. Duncanson v. State, 509 N.E.2d 182, 186 (Ind. 1987).

Had Castillo objected and requested an admonishment, this might be a different question. But the fundamental error exception is not a safe harbor for defendants who violate the contemporaneous objection rule and is therefore deliberately kept very narrow. Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). Because I think only a small amount of the prosecutor's closing argument was inappropriate, I believe that narrow exception is not met here.

Accordingly, I respectfully dissent.