## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 24 2018, 6:27 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Drake,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 24, 2018

Court of Appeals Case No.
49A02-1710-CR-2278

Appeal from the Marion Superior Court

The Honorable Grant W. Hawkins, Judge

Trial Court Cause No.
49G05-1609-MR-36877

**Vaidik, Chief Judge.**

# Case Summary

[1] Robert Drake was convicted of murder and sentenced to a below-advisory term of fifty years. He now appeals, arguing that the evidence is insufficient to support his conviction and that the trial court abused its discretion in sentencing him. We affirm.

# Facts and Procedural History

[2] The evidence most favorable to the verdict establishes that in September 2016, Joshawa Burge, Cody Abell, Dominique Dunbar, and Joshua Hatfield lived together in a house at 1102 North Kealing Avenue in Indianapolis. Cody's dog also lived in the house. Joshawa, Cody, and Dominque knew each other from college and had lived in the house for a couple years; Joshua had recently moved in. Two additional men, Danny Campbell and Travon Smith, were temporarily staying at the house. Drake was "cousins" with Danny and had previously visited the house, but it had been "a long time," at least six months. Tr. Vol. II p. 161. As of September 2016, Danny and Drake "weren't talking anymore" because of an argument. *Id.* at 163.

[3] James Collier lived across the street from 1102 North Kealing. Although it was a high-crime area (James had video-surveillance equipment installed at his house), he did not notice a lot of activity at 1102 North Kealing. On Tuesday, September 6, 2016, James got home from work a little before 9:00 p.m. and heard "a lot of loud talking" and "hustling type stuff" in the front yard of 1102

North Kealing. Tr. Vol. III p. 123. He saw four to six men that he did not associate with 1102 North Kealing. According to James, the men were "trying to figure out what they were gonna do." *Id.* at 124.

[4] Around the same time, the housemates were playing video games in various parts of the house: Joshawa was in the living room; Danny and Travon were in the adjacent dining room; Cody was in his bedroom upstairs with the door open; and Joshua was in his bedroom upstairs with the door open. Dominque was in his bedroom upstairs but had just come downstairs to get a drink. Around 9:00 p.m., there was a knock on the front door. Suspecting it was the pizza they had ordered, Dominque, who was passing by the front door, went to answer it. As Dominique reached for the door handle, the door was pushed in from the outside. Joshawa looked up and saw Drake—who he immediately recognized as Danny's cousin—standing in the doorway. Joshawa did not expect to see Drake "that night or any other night." Tr. Vol. II p. 93. Joshawa then saw a hand holding a gun come through the doorway behind Drake and hit Dominique in the head with the gun, knocking off his glasses.

[5] Drake entered the house "like he had a purpose." *Id.* at 123. As Drake passed through the living room on his way to the dining room—where his cousin Danny and Travon were—he said, "They're back here. They're back here, get him." *Id.* at 94. From their bedrooms, Cody heard someone (who was not one of his housemates) shout "he's back here," *id.* at 151, and Joshua heard a commotion followed by someone saying in a loud voice, "He's in here. Come get him," *id.* at 191. Danny and Travon got up and ran toward the kitchen. *Id.*

at 136. Drake "chased them." *Id.* at 98. Joshawa—who stayed in the living room because Drake had ordered him to "[g]et down"—saw a "scuffle going on by the back door in the kitchen." *Id.* at 94, 99. Specifically, Drake, Danny, and Travon were "wrestling and fighting in the kitchen," and Danny and Travon "were trying to get out the back door, away from" Drake. *Id.* at 99.

[6] In the meantime, Dominique pushed the other would-be intruders out the front door and onto the porch. Once outside, a shot was fired, striking Dominique in the left eye and killing him. Cody and Joshua, accompanied by the dog, ran downstairs and out the open front door. They saw Dominique lying at the bottom of the porch stairs. As three men were running away from the house, the dog chased them to a silver car that was parked across the street. The dog grabbed one of the men by the ankle as he was getting into the passenger side of the car; several shots were fired, killing the dog. The men drove away in the car.

[7] After the men drove away, Cody was standing in the front yard when he saw a man who looked like Drake run behind him. A "frantic" Joshua flagged down an Indianapolis Metropolitan Police Department officer. *Id.* at 71. Homicide detectives and crime-scene technicians arrived on the scene shortly thereafter. Based on the fired cartridges and the bullets recovered from the bodies of Dominique and the dog, it was determined that three guns were fired. Tr. Vol. III p. 98.

[8] Detective John Breedlove immediately started looking for Drake. On September 19, Detective Breedlove received a phone call from a bishop in Nashville, Tennessee. The bishop said that Drake was in Nashville and "wanted to turn himself in." *Id.* at 184. Detective Breedlove drove to Nashville to speak with Drake. After being given *Miranda* warnings, Drake gave a videotaped statement. *See* Ex. 77. Drake said that on the night of September 6 he went to 1102 North Kealing, alone, to reconcile with Danny, that he did not know the three men that came to the house after him, that he did not say anything like "get him" when he entered the house, and that he pushed Danny and Travon through the house in order to save their lives. When Detective Breedlove told Drake that his story was not believable, Drake maintained that he did not know the three men and that it was a "coincidence" that they came to the house right after him. *Id.* (Drake describing it as an "ambush"). Drake said he left Indianapolis for Nashville the morning after the shooting.

[9] The State charged Drake with murder (during the commission or attempted commission of burglary), Level 1 felony burglary, and Level 5 felony criminal confinement (Danny). Before trial, the State dismissed the criminal-confinement charge.[1] At the jury trial, the State's theory was that Drake was an accomplice. *See* Tr. Vol. IV p. 30 (prosecutor arguing that Drake did not shoot

---

[1] Neither Danny nor Travon testified at trial. The State could not locate Travon, *see* Tr. Vol. III pp. 163-64, and although the State could locate Danny, it decided not to call him as a witness at trial because it believed that his testimony would not be truthful, *see id.* at 243-44; Appellant's App. Vol. II p. 85 ("State's Notice of Intent to Not Call a Witness at Trial").

Dominique; rather, Drake's accomplice did). The jury was shown a video from James's surveillance-video system. Drake was convicted of murder and burglary.

[10] At the sentencing hearing, the trial court vacated the burglary conviction due to double-jeopardy concerns. The trial court identified the following mitigators: Drake did not have a criminal history (this was his first conviction), he was a "responsible family man," and he's "been employed to the best of [his] ability." Tr. Vol. IV p. 110. As for aggravators, the court found that the crime required careful planning and resulted in a dog's death; however, the court did not give the dog's death "a whole lot of weight." *Id.* at 111. Finding that the mitigators outweighed the aggravators, the court imposed a below-advisory sentence of fifty years. *See* Ind. Code § 35-50-2-3 (the sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years). The court said that this would have been a good case for imposing the minimum sentence had Drake "disclos[ed] those who were involved."[2] Tr. Vol. IV p. 111.

[11] Drake now appeals.

---

[2] Detective Breedlove testified at trial that the case was still open as to the unidentified men. *See* Tr. Vol. III pp. 169, 208.

# Discussion and Decision

[12] Drake raises two issues on appeal. First, he contends that the evidence is insufficient to support his conviction for murder as an accomplice. Second, he contends that the trial court abused its discretion in sentencing him.

# I. Sufficiency of the Evidence

[13] Drake contends that the evidence is insufficient to support his conviction for murder because he did not act as an accomplice. When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* It is not necessary that the evidence "overcome every reasonable hypothesis of innocence." *Id.* (quotation omitted). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

[14] A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. Ind. Code § 35-41-2-4. "It is well established that a person who aids another in committing a crime is just as guilty as the actual perpetrator." *Green v. State*, 937 N.E.2d 923, 927 (Ind. Ct. App. 2010), *trans. denied.* It is not necessary for a defendant to have participated in every element of the crime to be convicted as an accomplice. *Id.* There is no

bright line in determining accomplice liability; the particular facts and circumstances of each case determine whether a person acted as an accomplice. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). The fact-finder considers several factors, including: (1) presence at the scene of the crime; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Id.* That a defendant was present during the commission of a crime and failed to oppose the crime is not sufficient, alone, to convict him, but it may be considered in conjunction with other factors. *Id.*

[15]     Drake argues that "[t]he evidence shows that [he] **could** have been involved, but it does not come close to showing beyond a reasonable doubt that he **was** involved." Appellant's Br. p. 16. The evidence shows that on the night of September 6, Drake went to 1102 North Kealing, where his cousin Danny—whom he was not talking to at the time—was staying. Drake had not been to the house in at least six months. A little before 9:00 p.m., James, who lived across the street from 1102 North Kealing, saw a group of four to six men that he did not associate with the house. The men were talking loudly in the front yard and trying to figure out what to do. Drake then entered the house "like he had a purpose." A man behind Drake hit Dominque in the head with a gun, knocking off his glasses. Joshawa testified that as Drake passed through the living room on his way to the dining room (where his cousin Danny and Travon were), he said, "They're back here. They're back here, get him." Cody and Joshua testified that they heard something similar. Drake ordered

Joshawa, who had since stood up, to "[g]et down." When Danny and Travon ran toward the kitchen, Drake chased them. A fight broke out in the kitchen, and Danny and Travon tried to get out the back door away from Drake. While this was going on, Dominque pushed the other would-be intruders out the front door and was shot in the left eye, killing him. Later, after the three men left in the car, Cody was standing in the front yard when he saw a man who looked like Drake run behind him. The morning after the shooting, Drake left Indianapolis for Nashville, Tennessee. *See, e.g.*, *Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990) ("Evidence of flight may be considered as circumstantial evidence of consciousness of guilt."). The evidence is sufficient to support the jury's verdict that Drake knowingly or intentionally aided, induced, or caused the offense.

[16] Nevertheless, Drake highlights, among other things, that he did not have a gun, that he did not leave in the car with the other men, and that the housemates provided inconsistent testimony regarding what was said when he entered the house (for example, "He's in here" v. He's back here"). These, however, are all requests for us to reweigh the evidence. The jury was presented with all of this evidence, including Drake's version of events as contained in his videotaped statement, and found him guilty. We therefore affirm his conviction for murder.

# II. Sentencing

[17] Drake next contends that the trial court abused its discretion in sentencing him to fifty years. Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal for an abuse of discretion. *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[18] Specifically, Drake argues that the trial court abused its discretion in identifying as an aggravator the fact that he did not "disclos[e] those who were involved."[3] Tr. Vol. IV p. 111 (trial court: "he must know something"). Drake asserts that "[t]he record does not support the trial court's finding that [he] **refused** to disclose the [men's] names" because there is "no evidence that [he] knew their names." Appellant's Br. p. 19. Despite Drake's claim in his videotaped statement that he did not know the other men and that it was just a "coincidence" that they came to the house around the same time that he did, the jury found Drake guilty as an accomplice, and there was evidence that he acted in concert with them. Based on this evidence, the court properly found that Drake had information that could have helped the police identify the other

---

[3] The parties dispute whether the trial court found this as an aggravator or failed to find his remorse as a mitigator (based on his failure to disclose). Regardless of how the trial court characterized this, we find no abuse of discretion.

men involved in this case.[4]  Accordingly, the trial court did not abuse its discretion in identifying this as an aggravator and in sentencing Drake to a below-advisory term of fifty years instead of the minimum term of forty-five years.

[19]   Affirmed.

Barnes, J., and Pyle, J., concur.

---

[4] Drake argues that even if the record reflected that he knew the men's names, "defendants who incriminate other individuals are often subjected to violent acts of retaliation."  Appellant's Br. p. 20.  There is no evidence that this is the reason why Drake did not disclose the names of the other men.  At sentencing, Drake made no such claim and continued to assert that he was "in the wrong place at the wrong time."  Tr. Vol. IV p. 106.