## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 27 2019, 10:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Rory Gallagher
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Larry J. Thomas,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 27, 2019

Court of Appeals Case No.
18A-CR-1714

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1603-MR-9636

**Mathias, Judge.**

[1] Following a jury trial in Marion Superior Court, Larry Thomas ("Thomas") was convicted of murder and Level 2 felony attempted robbery resulting in

serious bodily injury. Thomas appeals and presents two issues, which we restate as: (1) whether the prosecuting attorney committed misconduct during the State's closing argument that amounted to fundamental error; and (2) whether the trial court should have entered a judgment of conviction on the attempted robbery count as a Level 5 felony instead of a Level 2 felony. We conclude that the trial court did not commit fundamental error, but we also conclude that the trial court's oral sentencing statement clearly indicated the court's intention to enter judgment of conviction on the attempted robbery count as a Level 5 felony. Accordingly, we affirm Thomas's conviction for murder but reverse his conviction for attempted robbery as a Level 2 felony, and we remand with instructions that the trial court instead enter judgment of conviction for attempted robbery as a Level 5 felony.

## Facts and Procedural History

[2] On February 29, 2016, the victim in this case, Rito Llamas-Juarez ("Llamas"), went to the home of his step-daughter Xiomara Linares ("Linares"), where she lived with her boyfriend Jose Padilla ("Padilla"), her son M.L., Padilla's son A.P., and Padilla's brother-in-law Marcos Hernandez ("Hernandez"). Llamas, who spoke little English, wanted to buy two iPhones for his daughters. He therefore sought the help of M.L., who spoke English and was familiar with the smartphone app Offer Up, which facilitates direct, person-to-person sales between its users. Tr. Vol. II, p. 171. M.L. had previously purchased a phone using the app and found a person with a user name of "Sports" offering for sale two iPhone 6 smartphones for $500. Tr. Vol. II, pp. 173, 243. M.L. negotiated

the price down to $400 and agreed to meet the seller in the parking lot of an apartment complex located near the intersection of 39th Street and Post Road in Indianapolis.

[3] Hernandez drove Llamas and M.L. to the arranged meeting place, but the seller did not arrive. They therefore returned to Linares's home. A while later, while M.L. and Hernandez were eating at a fast-food restaurant, they received a telephone call from the seller asking them to meet in the parking lot in the rear of the apartment complex. Hernandez drove back home to pick up Llamas and A.P. and drove to the parking lot. Llamas sat in the front passenger seat, while M.L. and A.P. sat in the back seat. By then, it had grown dark, and the parking lot was not very well lighted. In the parking lot were two young men, one of whom was holding a T-Mobile bag. Presuming that this was the seller, Hernandez parked nearby.

[4] The two young men waiting in the parking lot walked toward the car. M.L. got out of the car to talk to the men, and Llamas opened the passenger side door to talk. The man holding the T-Mobile bag handed an iPhone 6 box to Llamas. As M.L. spoke with the two men, a third man with dreadlocks in his hair and wearing a hooded sweatshirt approached the car holding a rifle. This man, later identified as Thomas, told M.L. and the other occupants of the car to "give us everything you got." Tr. Vol. II, pp. 186, 200. One of the other two men put his hand inside M.L.'s pocket and attempted to grab his cellphone. M.L. shoved the man and fled the scene. As Llamas struggled with Thomas in an attempt to shut the car door, Thomas shot Llamas in the chest. After Thomas fired the

rifle, he and the other two men fled, and Hernandez drove back home. When M.L. heard the shots, he ran home. By the time he got back home, Hernandez had already arrived. They pulled a lifeless Llamas out of the car, and M.L. called 911. An ambulance arrived and took Llamas to the hospital, where he was pronounced dead.

[5] When the police interviewed Hernandez, M.L., and A.P., they all initially told the police that Hernandez was not involved and that M.L. had been driving. They did so on Hernandez's instructions because, as Hernandez later explained, he had already been deported once, was concerned about his immigration status, and did not want to get involved in a murder investigation.

[6] At the scene of the shooting, the police found two empty .223 caliber shell casings and a fresh cigarette butt. The police also found fingerprints on the iPhone 6 box, which contained an iPhone 5c with a cracked screen. M.L. also gave the police his iPhone, which revealed that the seller's Offer Up user name was "Sports." The police then obtained a warrant to compel the operator of the Offer Up app to produce documents relating to the user account with that user name. These documents revealed that the user name "Sports" was linked with Thomas's Facebook identity.[1]

[7] On March 5, 2016, the police obtained a search warrant for Thomas's apartment, which was located near the site of the shooting. When executing the

---

[1] The Facebook account was named "SlaughtaBoi Larro," but had originally been named "Larry Joe Thomas, Jr." Tr. Vol. II, p. 243–44; Ex. Vol, State's Exs. 55(A), 55(B), 56.

warrant, the police found a box of .223 caliber bullets. The police also executed a warrant allowing them to obtain a sample of Thomas's DNA. When the police swabbed Thomas's cheek for DNA, he claimed to have been robbed a few nights before. And when asked about his phone, Thomas told the police that he had recently bought a new phone because his old one had been stolen during the alleged robbery. Thomas claimed that he had been robbed by three men near his apartment and had been pistol whipped and stomped on, but Thomas had no visible injuries to corroborate these claims. The DNA found on the cigarette butt at the scene of the crime matched Thomas's DNA. And his fingerprints were found on the iPhone 6 box that had been given to M.L.

[8] The police also obtained a warrant to search Thomas's iPhone. The name associated with Thomas's iPhone was "Sporty Racks," and his phone was connected to the Offer Up records for "Sports" through Apple's iOS Keychain password storage feature. Tr. Vol. III, pp. 153, 201–02. When the police searched Thomas's iPhone, they discovered photos and videos of Thomas holding an AR-15-style rifle.[2] It also contained photos that matched those used in the Offer Up listing by "Sports." In addition, Thomas's email account contained notification messages from Offer Up and from people inquiring about the phones for sale, and Thomas's phone contained a screenshot taken on the morning of March 1, 2016 of a news article reporting on the shooting. Later that same morning, Thomas used Facebook Messenger to communicate with

---

[2] An AR-15 uses .223 caliber ammunition.

his stepbrother about the shooting. That night, Thomas changed his cell phone number.

[9] Further investigation revealed that the telephone number that "Sports" used to contact M.L. was associated with the smartphone app "Pinger," which gives users a telephone number and allows them to send text messages and telephone calls over the Internet. Tr. Vol. II, p. 249, Vol. III, p. 221. Using records obtained from the maker of the Pinger app, the police learned that a Pinger account was created with Thomas's email account on February 29, 2016—the night of the shooting—at approximately 7:30 p.m. Tr. Vol. III, p. 221–22. The Offer Up user "Sports" used this Pinger account to contact M.L. until 9:52 p.m. that evening. A second Pinger account was then created at 9:55 p.m. using a different email address, and "Sports" used this second account to contact M.L. three more times that night.

[10] The first Pinger account connected to the IP address of Thomas's home internet router and made the calls to M.L. from this IP address. The second Pinger account also connected to Thomas's IP address when it was created, and one telephone call was placed to M.L. from this IP address. The other two times the second Pinger account contacted M.L. that night, it did so via a different IP address. But this second Pinger account again contacted Thomas's IP address at 10:09 p.m. and 10:10 p.m. that night, which was only one minute before M.L. returned home and telephoned 911. Pinger was then uninstalled from Thomas's phone at 10:16 p.m.

[11] On March 11, 2016, the State charged Thomas with murder, felony murder, and Level 2 felony attempted robbery resulting in serious bodily injury. A jury trial commenced on May 14, 2018, at which Thomas conceded most of the State's factual assertions. Specifically, Thomas admitted: that he lived in the apartment near the scene of the crime; that he went by the name "SlaughtaBoi Larro" and "Sporty Racks"; that he had purchased an AR-15 and .223 ammunition in February 2016; that he took photos of his rifle using his phone that he later deleted; that he and two friends agreed to "dupe" someone into buying broken iPhones and used the Offer Up app to advertise for sale two non-broken iPhones; that he communicated with M.L. on the night of the murder using the Pinger app on his phone; that he smoked a cigarette at the scene of the crime; that he brought his AR-15 rifle to the sale; that Llamas was shot during the attempted sale; that his rifle was the murder weapon; and that the ammunition he had purchased was used to shoot Llamas. Tr. Vol. IV, pp. 10, 12–14, 17–18, 26–29, 36–39, 44, 48, 53. He also admitted that he had lied to the police when he initially claimed that he had been robbed on the night of the shooting, that he did not own any firearms, that he had not used Offer Up for weeks, and that he did not know what the Pinger app was. He also admitted that he had initially given the police a fake phone number. Tr. Vol. IV, pp. 72–78, 82.

[12] Thomas testified on his own behalf and gave the following version of events. He and his two friends, brothers Antwan and Anthony, were hanging out when Anthony came up with the idea to swindle someone by selling them broken

iPhones. He allowed Antwan to use his phone to set up the fraudulent sale on Offer Up, and, in exchange, Antwan would give Thomas half of the proceeds. Anthony wanted to bring Thomas's rifle, and although he thought it unnecessary, Thomas allowed Anthony to take his rifle to the exchange point. Once in the parking lot, Thomas stood with Antwan, who held the T-Mobile bag. After Antwan handed the bag to Llamas, Anthony pulled out the rifle and demanded money. Thomas ran away from the scene and heard a gunshot but did not return to the scene. Thomas saw Anthony the next day, and Anthony returned Thomas's phone but not the rifle.

[13] Thomas admitted that he did not tell the police this story but claimed to have done so because he did not want Anthony, who he thought still had the rifle, to know that he was cooperating with the police. Thomas admitted that he intended to commit theft but denied any intent or plan to commit robbery or a shooting.

[14] In the State's closing argument, the prosecuting attorney made several comments that Thomas now claims were improper, which we summarize as follows: (1) the prosecutor asked the jury to imagine what it was like for M.L. to testify and that he told the truth; (2) the prosecutor stated that it was understandable why Hernandez lied when he first spoke with the police but was truthful in his testimony; (3) the prosecutor stated that Thomas lied to the police and lied on the stand; (4) the prosecutor implied that Thomas had worn fake eyeglasses during the trial and that his testimony was similarly fake; and (5) the prosecutor stated that Thomas's testimony was "made up" just like his earlier

statement to the police. Tr. Vol. IV, pp. 118–20, 124, 138–39. Thomas objected only to the first of these statements and moved to strike the comment. The trial court sustained the objection and admonished the jury that it was the sole judge of witness credibility.

[15] At the conclusion of the trial, the jury found Thomas guilty as charged. At the sentencing hearing held on July 27, 2018, the trial court entered judgment of conviction on the count of murder, but not the count of felony murder, based on double jeopardy concerns. The parties then engaged in a discussion about the propriety of entering a judgment of conviction on the count of Level 2 felony robbery causing serious bodily injury, and the trial court ultimately concluded that it would enter judgment of conviction on this count as a Level 5 felony, not a Level 2 felony. The court sentenced Thomas to the advisory sentence of fifty-five years on the murder conviction and a consecutive sentence of five years on the robbery conviction, with two years executed in community corrections and three years suspended to probation. Thomas now appeals.

## I. Prosecutorial Misconduct

[16] Thomas first argues that the prosecuting attorney committed misconduct when he referred to the veracity of the State's witnesses and Thomas's lack of veracity.

> In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise. A

prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (citations and internal quotation marks omitted).

[17]   If a defendant believes that the prosecutor's statements constitute misconduct, the proper procedure is to object to the statement and request the trial court to admonish the jury. *Lowden v. State*, 51 N.E.3d 1220, 1224 (Ind. Ct. App. 2016), *trans. denied* (citing *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). If the defendant is not satisfied with the admonishment, then he should move for a mistrial. *Id.* The failure to request an admonishment or to move for mistrial results in waiver of the issue on appeal. *Id.*; *see also Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012) (noting that a defendant must request a mistrial if he considers the trial court's admonishment to be inadequate and the failure to move for a mistrial results in waiver).

[18]   Here, Thomas objected at trial to only one of the statements by the prosecuting attorney that he now claims were improper. Specifically, he objected when the prosecuting attorney asked the jurors to put themselves in M.L.'s position and argued that "they told the truth." Tr. Vol. IV, p. 118. Thomas immediately objected and moved to strike. The trial court sustained this objection and

instructed the jurors that they were the ultimate judges of the credibility of the witnesses. We presume a trial court's admonishment to the jury was sufficient to cure any alleged error in the prosecuting attorney's statements. *Johnson v. State*, 901 N.E.2d 1168, 1173 (Ind. Ct. App. 2009).

[19] Moreover, if he considered this admonishment inadequate, Thomas should have moved for a mistrial, but he did not. Because Thomas did not request a mistrial, the issue is waived. *See Lowden*, 51 N.E.3d at 1224. Thomas's remaining claims of prosecutorial misconduct are also waived because Thomas failed to object to the statements at the time they were made. *See id.*

[20] Because he failed to preserve his claim of prosecutorial misconduct for appeal, Thomas must, in addition to establishing prosecutorial misconduct, also establish that the misconduct constituted fundamental error. *Lowden*, 51 N.E.3d at 1224–25 (citing *Ryan*, 9 N.E.3d at 667–68). In *Ryan*, our supreme court set forth the high burden required to establish fundamental error:

> Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not sua sponte raising the issue because alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm. The element of such harm is not established by the fact of ultimate conviction but rather depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the

ascertainment of truth to which he otherwise would have been entitled. In evaluating the issue of fundamental error, our task . . . is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such *an undeniable and substantial effect on the jury's decision* that a fair trial was impossible.

9 N.E.3d at 668 (emphasis in original) (citations, internal quotation marks, and footnote omitted).

[21] The *Ryan* court noted that it is "highly unlikely" for a defendant to prevail on a claim of fundamental error relating to prosecutorial misconduct. *Id*. (citing *Baer v. State*, 942 N.E.2d 80, 99 (Ind. 2011)). This is in part because jurors are aware that closing arguments are "partisan advocacy," not impartial statements of the law and thus are likely to have little effect on the jury's understanding of the law. *Id*.; *Castillo*, 974 N.E.2d at 469 n.11. It is under this demanding standard that we review Thomas's claims of prosecutorial misconduct.

[22] As already stated, the first instance of alleged misconduct occurred when the prosecuting attorney asked the jurors to put themselves in M.L.'s position and argued that the State's witnesses "told the truth." Tr. Vol. IV, p. 118. Although the prosecutor's comments may have been improper, they did not constitute fundamental error. Although a prosecutor may not personally vouch for a witness, he or she may comment on the credibility of a witness so long as the assertions are based on reasons which arise from the evidence. *Ryan*, 9 N.E.3d at 671. Here, there is no indication that the prosecutor was stating that he

personally knew that the witnesses were truthful based on facts outside the evidence, which would be impermissible. Moreover, the trial court sustained Thomas's objection and admonished the jury that it was the ultimate judge of credibility. Thus, we cannot say that this comment constituted fundamental error.

[23] Thomas next complains that the prosecuting attorney stated: "Marcos [Hernandez], the driver, lies when he first talked to the officer. Understandably why, I think. He was truthful about it now, came in later and gave a statement. Truthful about why he did it. And told the story that—that he was the driver." Tr. Vol. IV, p. 120. The prosecutor was simply acknowledging that Hernandez and the others initially, and falsely, claimed that Hernandez was not driving the car on the night of the shooting and did so because Hernandez did not want to get involved due to his immigration issues. And with regard to the comment that Hernandez was being "truthful now," this appears to have been a comment on the evidence, i.e., the testimony of the other witnesses that Hernandez was driving. Thus, this comment did not constitute fundamental error.

[24] The third statement that Thomas complains about is when the prosecutor argued that Thomas: "[I]n his statements [to the police] he lied about everything that first time around, you know that. And he lied effortlessly. It was just amazing how he just s[a]t there and talked to the detective effortlessly and lied about everything. The same way he did today." *Id*. at 124. Again, there is no indication that the prosecutor was referring to anything outside the record in arguing that Thomas lied to the police. To the contrary, Thomas *admitted* that

he lied to the police during his first interview by claiming that he was not at the scene of the shooting and had instead been robbed himself on the night in question. Thus, the prosecutor's comments were a comment on the evidence of Thomas's untruthful character and did not constitute misconduct, let alone fundamental error.

[25] Thomas next complains that, during the State's rebuttal argument, the prosecuting attorney stated that Thomas's testimony was "as fake a[s] the glasses wor[n] to every[]day of the trial except this one. Did he need glasses? Why isn't he wearing them today? Because they're fake, just like what he got up in the stand and told you there." *Id.* at 135. There was no evidence presented regarding whether Thomas needed prescription eyeglasses. Thus, the prosecutor's comment was improper, but it was relatively innocuous, and there was other evidence that Thomas had been untruthful in his testimony. Moreover, the evidence against Thomas was exceptionally strong. We therefore cannot say that this comment constituted fundamental error.

[26] Lastly, Thomas complains that, during the State's rebuttal argument, the prosecuting attorney noted that Thomas testified to having only handled the iPhone box to take photos. Yet his fingerprints were found inside the box. The prosecuting attorney therefore stated that his was "[b]ecause [Thomas] lied. Because everything he told you from that stand except for his name was made up, just like the story he told to [the investigating detective]." Tr. Vol. IV, pp. 138–39. This comment was clearly based on the evidence indicating that

Thomas's testimony was not truthful and was therefore not improper, let alone fundamental error.

[27] In short, we reject Thomas's claim that the prosecutor's comments during the State's closing arguments constituted fundamental error.

## II. Sentencing

[28] The jury found Thomas guilty of murder, felony murder, and Level 2 felony attempted robbery resulting in serious bodily injury. At the sentencing hearing, the trial court entered judgment of conviction on the murder count but not the felony murder count due to double jeopardy concerns. With regard to the attempted robbery count, the trial court indicated that it would enter a judgment of conviction on the lesser-included offense of attempted robbery as a Level 5 felony, also because of double jeopardy concerns. The trial court then imposed a consecutive sentence of five years on this count, with three years executed in community corrections and two years suspended to probation. The trial court's community corrections order lists Thomas's robbery conviction as a Level 5 felony. However, in its written sentencing statement and abstract of judgment, the trial court indicated that the attempted robbery conviction was a Level 2 felony.

[29] Both parties agree that the trial court intended to enter a judgment of conviction on the attempted robbery count as a Level 5 felony. We also agree that this was the trial court's intention. The trial court clearly indicated at the sentencing hearing that it intended to enter judgment of conviction as a Level 5 felony in

order to avoid any double jeopardy implications. And the trial court imposed a sentence that is statutorily authorized for a Level 5 felony, but below the ten-year minimum sentence for a Level 2 felony. Moreover, the community corrections order states that Thomas's attempted robbery conviction was "a Level 5 felony (reduced by operation of law)." Appellant's App. Vol. II, p. 203.

[30] We therefore reverse the trial court's sentencing order to the extent that it states that Thomas's conviction for attempted robbery was a Level 2 felony, and we remand with instructions that the court correct both its sentencing order and the abstract of judgment to reflect that Thomas's conviction for attempted robbery is a Level 5 felony, not a Level 2 felony.

[31] Affirmed in part, reversed in part, and remanded.

Vaidik, C.J., and Crone, J., concur.