

**FILED**

Jun 26 2023, 8:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

Susan D. Rayl
Hand Ponist Smith & Rayl, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Assistant Section Chief, Criminal
Appeals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Steven Ray Hessler, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 26, 2023 <br><br> Court of Appeals Case No. <br> 22A-CR-989 <br><br> Appeal from the <br> Shelby Circuit Court <br><br> The Honorable <br> Trent E. Meltzer, Judge <br><br> Trial Court Cause No. <br> 73C01-2008-FA-1 |

**Opinion by Judge Foley**
Judge Tavitas concurs.
Judge Vaidik concurs in part and dissents in part.

**Foley, Judge.**

[1] Steven Ray Hessler ("Hessler") was convicted after a jury trial of two counts of rape,[1] each as a Class A felony, nine counts of criminal deviate conduct, each as a Class A felony,[2] seven counts of burglary,[3] each as a Class A felony, and one count of robbery,[4] as a Class A felony for crimes committed between August 14, 1982, and August 17, 1985. The trial court sentenced Hessler to an aggregate sentence of 650 years executed. On appeal, Hessler raises three issues, which we restate as:

     I.      Whether the cumulative effect of multiple instances of alleged prosecutorial misconduct during the State's cross-examination of Hessler and its closing argument denied Hessler a fair trial;

     II.     Whether four of Hessler's Class A felony burglary convictions violated Indiana's common law prohibition on double jeopardy; and

     III.    Whether Hessler's sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2] We affirm.

---

[1] Ind. Code § 35-42-4-1.

[2] I.C. § 35-42-4-2.

[3] I.C. § 35-43-2-1.

[4] I.C. § 35-42-5-1.

## Facts and Procedural History

[3] Between August 14, 1982, and August 17, 1985, a rash of home invasions and sexual assaults occurred in Shelby County, Indiana. The crimes went unsolved for decades until the police reopened the investigation and arrested Hessler in 2020 after matching his DNA to one of the crimes.

[4] The first home invasion occurred on August 14, 1982. P.B.[5] was a thirty-two-year-old single mother, who lived in a home in Shelbyville with her two young daughters. Around 9:00 p.m., P.B. had put her children to bed and then fell asleep with the television on. She was awakened with Hessler, who was wearing a winter coat and stockings over his face, standing over her and wielding a knife. When P.B. woke up, she screamed, and Hessler brought the knife down by her ear and told her not to scream again. When he unzipped his coat, P.B. could see he was wearing a big belt buckle, a wallet with a chain, and a leather sheath for his knife; he also wore brown boots and smelled of gasoline. Hessler turned off all the lights and the television, looked out the windows, and had P.B. light a candle. Hessler was very talkative, asked P.B. for all of her money, and told her that he was being paid to do this, that he killed people in Vietnam, and that he had watched her and her boyfriend for a long time. He also threatened P.B. that there was a Black guy in the car outside that he could bring inside if he needed to, that he could take her, "shoot her up" with heroin,

---

[5] P.B. was named P.C. at the time of the offense.

and sell her to a pimp, that he would wake her daughters up and do to them what he did to her, that he could cut her "tits" off, and that he had killed people before, but she was lucky because he was not going to kill her. Tr. Vol. V pp. 134–37. He repeated several phrases when he talked: "you know what I'm saying?" and "you understand what I'm saying?" *Id*. at 137.

[5] Hessler had P.B. disrobe and then had her put on a nightgown and high heels. He asked if she had a camera (she did but had no film), guns, and a Pepsi. He asked if she had an enema set, but she did not. He forced her to submit to vaginal intercourse, to put her tongue in his rectum, and to perform oral sex on him. He asked P.B. if she had Vaseline, but she did not, so he used K.Y. Jelly to perform anal sex on her, during which he tied her hands behind her back with her pantyhose. Afterwards, Hessler made her wash between her legs in the bathroom, and he performed oral sex on her and again forced her to lick his rectum again and to perform oral sex on him. When he ejaculated, he told her, "to make sure that [she] swallowed every bit of that semen . . . not let any of it away." *Id*. at 147. Before he left, he told her that if she called the police or told anyone what had happened, that her kids would not come home from school, and that he would be back whether it be in five minutes, five years, ten years, or twenty years. He also told her that if she did not want it to happen again that she could get an alarm system or nail the windows shut and get a guard dog.

[6]     On November 1, 1982, T.M.[6] was a twenty-seven-year-old single mother and lived with her young son in a home located in Shelbyville. That night, she and her son went to sleep together in her bed around 7:30 p.m. because they were not feeling well. Around 9:30 p.m., she was awakened by a man, later identified as Hessler, placing two fingers on her lips and a knife to her throat. He was around six feet tall, wore a blue jacket, and black cowboy boots and had a black chain wallet. The knife that Hessler used was a switchblade with a button to flip it open. Hessler wore her son's stocking cap over his face with a slit cut across the top for his eyes. He told T.M. to go to the living room and asked her for money. Hessler was very talkative and told her that someone hired him to "beat [her] up," that he went to Vietnam, and that he had killed people before. *Id*. at 195. He threatened to get her addicted to drugs and that he had a "big [B]lack friend" outside in a car that "would be more than happy to come in and we could have a party." *Id*. at 197. Hessler asked for a Pepsi, but T.M. did not have any.

[7]     He told her that she had a choice between having him "beat" her up and have something happen to her son, or she could "entertain" him. *Id*. at 198. She told him she would entertain him, and he responded that now she could not say that he raped her. When they heard T.M.'s son in the hallway, Hessler allowed her to get her son back to her bed. Hessler picked out a nightgown and heels for her to wear and found an old red enema bag. He proceeded to give her three to

---

[6] T.M.'s name was T.P. in 1982.

four enemas. He took her back into the bedroom and forced T.M. to stroke his penis and put his penis in her mouth, but it was not erect. Hessler said he knew she had Vaseline because he had been "stalking" her "for a while" and wanted her to find it. *Id*. at 201. He put Vaseline on his penis and started masturbating and forced T.M. to lick his scrotum. He then told her to lick his rectum, or he would kill her son, and she complied. He forced her to have vaginal intercourse but could not ejaculate, so he again began to masturbate. He told T.M. "when I tell you I want you to put your mouth on it and you better take it all. Better not leave one drop and take every bit of it." *Id*. at 202. Hessler went to the bathroom afterwards to clean himself and told T.M. to clean herself too. He told her she had "very nice tits" and that he could just cut one off. *Id*. at 208. During the assault, Hessler repeated the phrase, "You know what I'm saying?" *Id*. at 201, 202.

[8] Hessler took her to the kitchen to show her where he gained entry to her home, saying "you did a pretty good job by keeping me out, but not quite good enough . . . better than most." *Id*. at 202. He told her if she went to the police, he would return even if it took him ten years. He gathered up everything he had touched, put it in a pillowcase, and stuffed it into his big jacket.

[9] On December 16, 1982, K.E. was sixteen years old and lived in a home in Shelbyville with her thirty-six-year-old mother, S.K., and thirteen-year-old brother. That evening, K.E. was in her bedroom when she saw a man, later identified as Hessler, standing at the end of her bed holding a switchblade knife and wearing a ski mask with holes in the eyes only, a baggy jacket that zipped,

and brown cloth gloves. Hessler threatened her not to talk and demanded to know who lived in the house and if there were any weapons there. At 9:40 p.m., S.K. arrived home and found Hessler holding a knife to K.E.'s throat. Hessler asked S.K. when her son would be home and started ransacking the room looking for money. When K.E.'s brother came home, Hessler told him to lay down on the ground and not say anything because he was going to rape his mother and sister.

[10] Hessler told K.E. and S.K. to remove their clothes, and he took S.K. into the bathroom. S.K. told him that both she and her daughter were on their periods, and he became mad and threw something against the wall. Hessler told her to unzip his pants, and she attempted to "give him a blow job." *Id*. at 248. While S.K. was inside the bathroom, K.E. could hear her mother gagging. Hessler was not happy with S.K.'s attempt, so he threw her on the bed and took K.E. into the bathroom. Hessler found Vaseline in the cabinet and told K.E. to use her tongue "to mess with his butt," but she was not able to do it. *Id*. at 228. He asked if K.E. had ever given a "blow job," and when she told him, "no," he told her she had to watch him masturbate. *Id*. at 228. Hessler forced his penis into her mouth and ejaculated.

[11] Hessler found their camera, but there was no film. He said he was going to make them "do things to each other" and take pictures of them in case they ever told anybody. *Id*. at 232. Hessler hogtied them and then tied them together with hosiery and cords, and then left for a couple of hours in order to get film. He returned, without film, and threatened that if they told anyone or called the

police he would come back and kill them. He also told S.K. that he was a cop, and if she reported it, he would know. While Hessler was there, he walked around the home looking out the windows, and was talkative. He said things that indicated he had been watching them, told S.K. that she needed to look into home security, and used phrases like, "you know what I'm saying" and "you know what I'm talking about." *Id.* at 233. S.K. repeatedly begged Hessler to leave, and he told her that he had a Black friend who he threatened would perform anal sex on her son. After Hessler finally left, the family got ready for work and school, and did not tell anyone about the crimes for fear that he would return and kill them. S.K. waited three years before reporting the crimes to the police.

[12] On February 2, 1983, L.H., who was twenty-three years old, was living in Shelbyville with her husband, D.H.[7] and was three months pregnant. L.H. was home alone in her bedroom watching television when a six-foot tall man in a ski mask with holes cut for his eyes and mouth, green coveralls with a zipper, and brown cloth gloves came around the corner of the door and pointed a gun at her. The man, later identified as Hessler, also had a long wallet that connected to a belt loop with a chain and a big pocketknife. He initially asked, "where are the drugs?" and started looking around the house. D.H. came home, and Hessler immediately pointed the gun at his head and asked him, "where's the drugs?" Tr. Vol. VI p. 18. They told him that they did not have

---

[7] D.H. was deceased at the time of trial.

any drugs, and Hessler, who was talkative, told them there was a Black man in a black van outside. He told them they were "dumb" because they did not lock their door and that they needed deadbolt locks and a big dog like a German Shepherd or Doberman. *Id*. at 19. Hessler asked them for money, stated that he had been in their home and had been watching them. He said he had killed someone before and could kill them both to make it look like a "murder-suicide." *Id*. at 20.

[13] Hessler made L.H. change into a "sexy" nightgown and gave her handcuffs to handcuff her husband. *Id*. He told L.H. that he wanted her to do "kinky" things to her husband. *Id*. at 21. Hessler forced L.H. to perform oral sex on her husband while he had the gun pointed at her husband's head. He told L.H. to continue performing oral sex until D.H. ejaculated and made her swallow it. Hessler masturbated while watching L.H. and D.H. Although Hessler said he wanted her to fill a douche bottle up with water and put it in her rectum using Vaseline, he never forced her to do it. He told L.H. to stick her tongue in D.H.'s rectum and move it around, and she complied. Hessler forced them to have vaginal intercourse while he watched and masturbated.

[14] After forcing the couple to do these things, Hessler told them they had a choice between being with him for two to three days or allowing him to take "nasty" pictures, so they chose the latter option. *Id*. at 25. He took pictures of L.H. and D.H. in different sexual poses and threatened to make copies of the pictures and spread them around the county. Hessler lectured them about safety, was very talkative, and frequently used the phrases "you know what I mean?" and "do

you understand what I'm saying?" *Id*. at 26. Before he left, he made sure that they washed anything he touched and told them he had a police scanner so he would know if they called the police.

[15] On February 18, 1984, L.C. was twenty years old and lived in a home in Fairland. After coming home from work at 9:30 p.m., L.C. was getting ready to take a shower when she saw a person standing in the doorway holding a gun while wearing a ski mask, brown gloves, and black shoes. The man, later identified as Hessler, had a long black wallet with a chain. L.C. screamed, and Hessler ordered her to sit on the bed and threatened to kill her if she kept screaming. He was very talkative and frequently used phrases like "do you understand what I'm saying?" and "you know what I'm saying?" *Id*. at 63. He ordered her to turn out the lights and lit a candle for light. He constantly looked out her bedroom window, said that she needed deadbolts on her doors, and told her to get a big dog and a gun for protection. Hessler asked her for a Pepsi and asked if she read the papers and knew who he was. He said he had done "this" before with other "ladies" and told them not to go to the police because he would kill them, but the police arrested the wrong guy and had to release him. *Id*. at 66. He told her that he did not care if it took five or ten years, he would kill them because "it came out." *Id*. He also told her that he had done the same thing previously to a mother and daughter in 1984, but "they didn't go to the police." *Id*.

[16] Hessler found a camera and asked if she had lingerie, which she did not, but told her to put on a pair of high heels and took pictures of her naked. He told

her that if she went to the police, he would have the pictures blown up and distributed around her workplace. He then got a belt from her closet and hit her with it so that she would "know [he meant] business." *Id*. at 72. By the way he talked, L.C. believed Hessler was twenty years old. He then asked L.C. for Vaseline, but because she did not have any, he had her apply Soft Soap to his penis and help him masturbate. Hessler ejaculated and then asked her if she had ever "had it in the butt." *Id*. at 75. He had brought an orange enema bag with tubing that he filled with water and proceeded to give her an enema. Afterwards, he told her to clean up in the shower while he cleaned up in her room by wiping things down and taking the top covers off of her bed. Before leaving, Hessler told her that he would be watching her, and if she got out of her bed, he would come back and kill her.

[17] On November 25, 1984, B.C.[8] was a single mother and lived with her young daughter in a house in Shelbyville. After putting her daughter to bed at 8:30 p.m., B.C. went to bed around 10:00 p.m. B.C. heard a crash and then heard a man's heavy footsteps in the hallway. The man, Hessler, came around the corner and pointed a gun at her. B.C. was so scared that she urinated down her leg, and Hessler said, "If you don't stop pissing yourself, I'm just going to kill you right now." *Id*. at 107. He was wearing a ski mask, a green jacket with two large front pockets, blue jeans, boots, and a wallet with a chain attached, and had a multi-tool knife. He told B.C. she left too many lights on and had too

---

[8] B.C.'s name was B.R. in 1984.

many "slits in [her] curtains" and needed to shut them. *Id.* at 108. Hessler lit a candle in the bedroom and told her to get on the bed, turn away from him, and cover her head.

[18] He looked through her drawers and asked if she had any pantyhose or money. When he found some pantyhose, he put them over his head instead of the ski mask. He asked if she had a camera, but she did not. Hessler had brought an enema bag with him, and he filled it with water and told her he was going to put the water inside of her and if she did not "hold it" he would kill her. *Id.* at 112. He then proceeded to give B.C. an enema and told her to hold the water or he would "blow [her] brains out" and kill her daughter. *Id.* at 113–14. He added water four times and told B.C. she did "pretty good" and could use the bathroom. *Id.* at 114. Hessler then became talkative and told B.C. that he had been watching her before he came into the house and asked her about working at the hospital and whether she knew T.M. and L.H. He told B.C. that he did this "same thing" to them and that he had told them whether it was "two years, five years or ten years," he would go back and kill them for going to the police. *Id.* at 117.

[19] Hessler then got on his hands and knees and forced B.C. to lick his anus. After that, he pulled Vaseline out of his coat pocket, and ordered her to masturbate him, and she complied. He also forced her to perform oral sex on him, and when he ejaculated, he told her to swallow "every single drop." *Id.* at 121. When explaining what he wanted her to do, Hessler often used the phrase, "do you understand?" *Id.* Before he left, he told B.C. that if she went to the police

he would return, dismember her, and cut off her breasts. He told her that she needed a dog like a Dobermann Pinscher for protection and deadbolt locks and talked about Vietnam. Hessler had her wash her whole body, and when he left, he took money, the washcloth she had used, the sheets off the bed, and her underwear so there would not be a "trace" of him. *Id*. at 127.

[20] On August 17, 1985, T.Y., who was twenty-nine years old, and R.Y., were a married couple living in a house in Fairland with their young daughter. On that night, T.Y. and R.Y. went to bed around 3:00 a.m. after her parents left, following an evening of playing cards. Their daughter was spending the night elsewhere and was not home. They were woken up by a man with a flashlight pointing a gun at them. The man, later identified as Hessler, told them, "I'm going to kill you both unless you do exactly what I say. This is a burglary, do you understand me?" *Id*. at 156. Hessler threatened that he would shoot them if either of them tried to run and asked if they had any guns. He was wearing a white t-shirt, black nylon jacket, black gloves, dirty green tennis shoes, and a stocking mask with only the eyes cut out. He told them he had been waiting for their guests to leave before he entered the house. He said that he had been in Vietnam and killed many people.

[21] T.Y. told Hessler that R.Y. had a heart condition and needed a pill, so he walked them to the kitchen at gunpoint. T.Y.'s knees buckled underneath her causing her to fall to the floor. R.Y. placed his body over T.Y. and said, "you're killing my wife." *Id*. at 159. Hessler hit R.Y. over the head with the gun, causing his head to hit T.Y.'s head. Hessler then ordered them back to the

bedroom, where he handcuffed R.Y. with handcuffs he brought with him and made him lie on the bed on his stomach. Hessler asked T.Y. if she had any pantyhose, and when he found some, he used his knife to cut them and tied R.Y.'s ankles to his wrists with the pantyhose and some shoelaces. He used his knife to cut into a jewelry box and took some jewelry and money. He also took approximately fifty Polaroid photos from T.Y.'s drawer, including intimate photos that she and her husband had taken together.

[22] Hessler then hogtied T.Y. on the bed, but she could not breathe and felt like she was going to faint, so Hessler cut her bindings. R.Y. had been unconscious but woke up and became upset. Hessler then got agitated and repeatedly hit R.Y. in the head with the gun, causing him to bleed profusely. At gunpoint, Hessler allowed T.Y. to go into the bathroom to get a towel to wrap R.Y.'s head because of the bleeding. Hessler told T.Y. that he was not "done with [her] yet" and led her to the attached garage at gunpoint. *Id*. at 170. Once in the garage, he turned off the light and threatened T.Y. that if she did not do exactly what he said, he would kill her and her family. He told her to masturbate, and then masturbate him, and she complied. He pulled out Vaseline and took his glove off and started masturbating himself. He stuck his tongue in her rectum, and then ordered her to do the same to him, and she complied. Hessler then began masturbating again, and when he ejaculated, he did so in T.Y.'s mouth and told her to swallow it, but she spit it out onto the garage floor.

[23] He tied her wrists to the garage door rail with pantyhose and told her, while pointing the gun to her head, that if she called the police he would come back in

a year, two years, five years, ten years, or twenty years to kill her and her family. Hessler left, and when he did not return, T.Y. was able to slip out of her bindings and call the police. T.Y. untied her husband and helped him to the front yard to wait for the ambulance to arrive. R.Y. struggled to maintain consciousness, and when he was taken to the hospital, he underwent surgery and slipped into a coma. R.Y. remained in a coma for four months and required several months of rehabilitation. Because of his head injury, R.Y. suffered lifelong deficits in his motor skills, the ability to talk and walk, and his memory, and he suffered from a decreased ability to control his emotions.

[24] After the crimes involving T.Y. and R.Y., police investigated the crimes and identified numerous suspects over the years. In 2019, police utilized novel familial DNA technology and identified Hessler and his brother as potential suspects. The police issued a subpoena to the water company for a copy of Hessler's water bill and payment when it came to their attention that he paid by envelope and check. After securing unavoidably shed DNA from Hessler's water bill payment, the DNA was compared to the sample taken from T.Y.'s garage floor, and a DNA profile showed that the sample was at least one trillion times more likely to have originated from Hessler than any unknown unrelated individual. The State obtained a search warrant for Hessler's home, and as a result of the search found the following: multiple enema bags, enema-related pornography, handcuffs, handcuff keys, ski masks, gloves, a green jacket, Vaseline, leather wallets with chains, multi-tool and switchblade knives, a police scanner, a bill of sale for a firearm from March 14, 1985, holsters,

Polaroid photographs taken from the home of T.Y. and R.Y., and Google searches related to some of the victims, their homes, their pictures, and articles regarding serial home invasions in Shelby County; some of Hessler's Google searches of the victims occurred on the anniversary of their burglary.

[25] On August 18, 2020, the State charged Hessler with twenty-four felonies related to seven home invasions committed between August 14, 1982, and August 17, 1985. Hessler filed a motion to dismiss the charges, and the trial court dismissed several of the charges because they were outside of the statute of limitations. A jury trial was held on the remaining nineteen charges, which included: two counts of rape, as Class A felonies; nine counts of criminal deviate conduct, as Class A felonies; seven counts of burglary, as Class A felonies, and one count of robbery, as a Class A felony. At trial, Hessler testified that his sperm was on T.Y.'s garage floor and that he was with T.Y. and in her house while R.Y. was injured, but claimed he was there because T.Y. asked him to come over after she injured R.Y. At the conclusion of the trial, the jury found Hessler guilty as charged. On April 1, 2022, the trial court sentenced Hessler to an aggregate 650-year-sentence. Hessler now appeals.

## Discussion and Decision

### I. Prosecutorial Misconduct

[26] Hessler argues that the State engaged in multiple acts of prosecutorial misconduct during the trial and that the cumulative effect of these multiple acts placed him in a position of grave peril to which he should not have been

subjected. Hessler claims that prosecutorial misconduct occurred both during Hessler's testimony and during the State's closing argument. Hessler objected to some of the alleged instances of prosecutorial misconduct but failed to object to all of the challenged acts. Specifically, Hessler asserts that the State engaged in misconduct by: (1) demeaning and speaking sarcastically to defense counsel; (2) speaking directly to Hessler and being argumentative and sarcastic to him; (3) accusing Hessler of making up his testimony after hearing the witnesses testify; (4) using a method of cross-examination where the State repeated the victim testimony and improperly placed the testimony in front of the jury for a second time; (5) improperly shifting the burden of proof to Hessler, and (6) misrepresenting the evidence during closing argument.

[27] In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine "(1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Castillo v. State,* 974 N.E.2d 458, 468 (Ind. 2012)). Whether a prosecutor's comments constitute misconduct is measured by reference to case law and the Rules of Professional Conduct. *Id*. "'The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.'" *Id.* (quoting *Cooper v, State,* 854 N.E.2d 831, 835 (Ind. 2006)). "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an

admonishment to the jury, and if further relief is desired, move for a mistrial."
*Id*. (citations omitted).

[28] Out of all of the alleged instances of misconduct that Hessler contends occurred during his trial, he only asked for an admonishment and mistrial after two occurrences. Tr. Vol. 9 pp. 97–98, 100. Therefore, only those two occurrences were preserved as claims of prosecutorial misconduct. *See Ryan*, 9 N.E.3d at 667. One of these properly preserved instances involved a statement during closing argument, which Hessler asserts was demeaning to defense counsel. "While 'comments that demean opposing counsel, especially in front of a jury, are inappropriate,' not all of the allegedly improper comments here are objectionable, [and] '[p]rosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable.'" *Id*. at 669 (quoting *Marcum v. State*, 725 N.E.2d 852, 859 (Ind. 2000) and *Cooper,* 854 N.E.2d at 836).

[29] The challenged comment was made in rebuttal closing argument and was a retort to defense counsel's closing argument. During the defense closing argument and following an objection by the State for mischaracterizing the evidence, defense counsel argued about the length of time that the State questioned Hessler on the stand and alleged that the State twisted the facts to deprive Hessler of a fair trial. Tr. Vol. 9 pp. 63–64. Then, during rebuttal closing, the prosecutor challenged defense counsel's characterization of the State's questioning of Hessler and the allegations that the State fabricated the charges and testimony:

And, you know, [defense counsel] said one statement during this. He says, they get a go at [Hessler]. You know why he asked 16-year-old [K.E.] whose first sexual encounter was this man's vile penis shoved down her throat. You know why he asked them? . . . . You know what this man, who says I'm attacking? You know what he asked that young lady? You recall it. Was he gentle.

*Id.* at 97. This statement was not an inappropriate response to defense counsel's characterization that the cross-examination of Hessler was "excruciatingly" long, and defense counsel's personal and professional character attack of the prosecutors. *Id.* at 63. The prosecutor compared his cross-examination of Hessler and defense counsel's cross-examination of K.E., one of Hessler's youngest victims, to remind the jurors that both Hessler and his victims were subjected to thorough cross-examination and difficult questions. We do not find that this challenged statement was misconduct, nor did it place Hessler in a position of grave peril to which he would not have been subjected otherwise.

[30] The second preserved statement involved the following statement during the State's closing rebuttal argument that Hessler alleges erroneously shifted the burden to him:

They talked about details. Well, you don't get it out of him. It's just details he picks up from listening to them testify. Because he said, what, twenty, twenty-five times, they've met, and no details besides that. Because it didn't happen. Because Bernadette [Hessler's aunt] was used. Now, she's passed. That's ridiculous. I'd say that's because he's making this story up. And he goes we

> can't cross.  And even [Defense Counsel] brought up [that] . . . we didn't call back [L.C.].
>
> Well, where was [L.C.] from?  Georgia.  And if he wants to put on a defense, why didn't you ask?
>
> [Defense Counsel]: Objection; burden shifting.

Tr. Vol. 9 pp. 99–100.

[31]     "It is improper for a prosecutor to suggest that a defendant shoulders the burden of proof in a criminal case."  *Bryant v. State*, 41 N.E.3d 1031, 1035 (Ind. Ct. App. 2015) (citing *Stephenson v. State,* 742 N.E.2d 463, 483 (Ind. 2001), *cert. denied*).  In making the challenged statement, the State was commenting on the evidence that Hessler presented in his own defense.  In presenting his defense against the charges, Hessler chose to testify.  When Hessler testified in an attempt to explain why he had conducted multiple Google searches on some of the victims and where they lived, he said it was at the request of his aunt who was deceased at the time of trial and, therefore, could not testify to support his explanation.  This challenged statement that Hessler claims shifted the burden of proof was a comment on that lack of evidence.  There was nothing improper about stating that the one person who could support Hessler's version of events was now deceased.  A prosecutor may comment on the credibility of the witnesses as long as the assertions are based on reasons which arise from the evidence.  *Ryan*, 9 N.E.3d at 670.

[32]     The State's argument was also not an inappropriate response to defense counsel's argument in closing that the State did not bring one of the victims back to testify in rebuttal to Hessler's testimony. In its argument, the State was merely pointing out that the information that defense counsel criticized the State for not presenting, could have been asked by defense counsel when he cross-examined the victim, and before she returned to her home out of state. Further, even if the statement was prejudicial, the trial court immediately admonished the jury as Hessler requested and minimized any prejudice by instructing the jury:

> Jurors obviously, you will be getting instructions at a later time that makes it very clear that the State of Indiana has the burden throughout these proceedings to prove all of the elements of these crimes beyond a reasonable doubt. It's the State's burden. The Defendant is presumed innocent.

Tr. Vol. 9 pp. 99–100. We, therefore, do not find that this challenged statement was misconduct and conclude that it did not place Hessler in a position of grave peril to which he would not have been subjected otherwise.

[33]     Hessler claims that the prosecutor engaged in multiple acts of misconduct resulting in a cumulative prejudicial effect that made a fair trial impossible. He concedes that many of the alleged acts that he challenges on appeal were not objected to by defense counsel. In fact, out of the approximately thirty-two alleged instances of misconduct, Hessler only objected to eleven of them. Additionally, many of the alleged instances of misconduct did not even occur in front of the jury, but instead occurred during a sidebar with just the attorneys

and the judge present. Where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, our standard of review is different. *Ryan*, 9 N.E.3d at 667. The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. *Id.* at 667–68. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* at 668. In other words, the defendant must show that, under the circumstances, the trial court erred in not sua sponte raising the issue because the alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." *Id.* In evaluating the issue of fundamental error in this context, we look at the alleged misconduct in the context of the entire trial, including the evidence admitted, the closing arguments of the parties, and the instructions to the jury, to determine whether the alleged misconduct had an undeniable and substantial effect on the jury's decision such that a fair trial was not possible. *Ward v. State*, 203 N.E.3d 524, 533 (Ind. Ct. App. 2023) (citing *Ryan*, 9 N.E.3d at 668).

[34] Looking at the alleged instances of prosecutorial misconduct cumulatively, we do not find that these alleged errors were so prejudicial to Hessler's rights as to make a fair trial impossible. Hessler was linked to the crimes against T.Y. and R.Y. through DNA and evidence discovered in Hessler's home that had been

taken from the home of T.Y. and R.Y. The crimes perpetrated against T.Y. and R.Y. bore many similarities to the crimes perpetrated against the other victims, including: the clothing worn by Hessler such as a ski mask, a chain wallet, gloves and big jackets; the use of the phrases do you understand? and do you know what I'm saying?; the use of Vaseline; sexual assaults involving the rectum, either forced enemas or oral penetration of the rectum; oral sex ending in Hessler ejaculating in the mouth of the victims; binding the victims with hosiery; cleaning up after himself and taking items from the crime scenes that he had touched; and threats to return and cause the victims harm in the future. Further, Hessler was in possession of many items associated with or involved in the crimes, including enema bags and enema-related pornography, Vaseline, handcuffs, handcuff keys, ski masks, gloves, a green jacket, leather wallets with chains, multi-tool and switchblade knives, a police scanner, a bill of sale for a firearm from March 14, 1985, and holsters. Additionally, Hessler's computer contained Google searches related to several of the victims and their addresses, articles regarding serial home invasions in Shelby County, and downloaded images of victims and their homes; some of Hessler's Google searches of the victims occurred on the anniversary of their burglary.

[35] Therefore, looking at the alleged instances of misconduct that were not preserved as prosecutorial misconduct and that occurred in the presence of the jury in light of the evidence presented at trial, we do not conclude that the alleged misconduct had an undeniable and substantial effect on the jury's

decision such that a fair trial was not possible. *See Ward*, 203 N.E.3d at 533. Thus, the alleged misconduct did not rise to the level of fundamental error.

## II.   Double Jeopardy

Hessler next argues that four of his burglary convictions violate the Indiana Constitution's prohibition against double jeopardy because they were enhanced by the same bodily injury that established other offenses for which Hessler was convicted. Four of Hessler's burglary convictions, those pertaining to P.B., T.M., L.H., and B.C., were enhanced to Class A felonies pursuant to the version of Indiana Code Section 35-43-2-1 at the time the offenses were committed, due to the resulting bodily injury suffered by the victims. We review double jeopardy violation claims de novo. *See Wadle v. State,* 151 N.E.3d 227, 237 (Ind. 2020); *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020).

Hessler is correct that, at the time he committed the crimes for which he was convicted, Indiana's double jeopardy clause prohibited the enhancement of an offense based on the same injury that established another offense for which the defendant had already been punished. Specifically, it prohibited multiple convictions if there is "'a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002) (quoting *Richardson v. State,* 717 N.E.2d 32, 53 (Ind. 1999)). Based on this, Indiana recognized the common law rule that "where one conviction 'is elevated to a class A felony based on the

same bodily injury that forms the basis of [another] conviction, the two cannot stand.'" *Strong v. State*, 870 N.E.2d 442, 443 (Ind. 2007) (quoting *Pierce,* 761 N.E.2d at 830) (citing *Richardson v. State,* 717 N.E.2d at 55 (Sullivan, J., concurring), 57 (Boehm, J., concurring in result))).

[38]     However, the Indiana Supreme Court significantly altered the test for double jeopardy in *Wadle* and *Powell*. In those cases, the Supreme Court set forth two new frameworks for analyzing whether a defendant's convictions violate principles of substantive double jeopardy. *Wadle*, 151 N.E.3d at 247–50; *Powell*, 151 N.E.3d at 264–65. The cases explicitly overruled *Richardson* and held that our substantive double jeopardy jurisprudence would no longer be governed by the Indiana Constitution but would, instead, be driven primarily by "statutory rules of double jeopardy." *Wadle*, 151 N.E.3d at 235. Specifically, *Wadle* set forth a test for "when a single criminal act or transaction violates multiple statutes with common elements and harms one or more victims." *Id.* at 247. Hessler's convictions implicate two statutes, and, thus, the *Wadle* test is implicated.

[39]     Several panels of this court have recognized that *Wadle* and *Powell* overruled the constitutional substantive double jeopardy test set forth in *Richardson* and the statutory and common law to create "one unified framework" for substantive double jeopardy claims. *Jones v. State*, 159 N.E.3d 55, 61 (Ind. Ct. App. 2020); *see also Gaunt v. State*, 209 N.E.3d 463, 466–67 (Ind. Ct. App. 2023); *Morales v. State*, 165 N.E.3d 1002, 1007 (Ind. Ct. App. 2021), *trans. denied*; *Woodcock v. State*, 163 N.E.3d 863, 871 (Ind. Ct. App. 2021), *trans. denied*; *Hill v. State*, 157

N.E.3d 1225, 1229 (Ind. Ct. App. 2020); *Diaz v. State*, 158 N.E.3d 363, 368 (Ind. Ct. App. 2020). We agree with these opinions and conclude that *Wadle* replaced the common law double jeopardy rules, including the common law rule upon which Hessler relies.

[40] Hessler asserts that *Wadle* does not apply to his convictions because the Supreme Court's decision in *Wadle* was prospective and not retroactive. However, this court recently held that *Wadle* does apply retroactively. *Sorgdrager v. State*, 208 N.E.3d 646, 652 (Ind. Ct. App. 2023), *trans. pending on other grounds*. Because the new substantive double jeopardy framework established in *Wadle* constituted a new rule for the conduct of criminal prosecutions, and such new rules are to be applied retroactively, *Sorgdrager* held that the *Wadle* analysis applies to cases that were not yet final at the time our Supreme Court adopted *Wadle*. *Id*. Here, Hessler's case was far from final when *Wadle* was adopted, and therefore *Wadle* controls.

[41] Because we conclude that *Wadle* replaced the common-law double jeopardy rules, and that it applies retroactively, we cannot consider Hessler's reliance on the common law rule that an offense cannot be enhanced based on the same injury that established another offense for which the defendant had already been punished. Further, because Hessler raises no argument that his convictions constitute double jeopardy under *Wadle*, we cannot say that his double jeopardy rights were violated.

## III. Inappropriate Sentence

Hessler next argues that his aggregate 650-year sentence is inappropriate. The Indiana Constitution authorizes appellate review and revision of a trial court's sentencing decision. *See* Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020). "That authority is implemented through Appellate Rule 7(B), which permits an appellate court to revise a sentence if, after due consideration of the trial court's decision, the sentence is found to be inappropriate in light of the nature of the offense and the character of the offender." *Faith v. State*, 131 N.E.3d 158, 159 (Ind. 2019).

Our review under Appellate Rule 7(B) focuses on "the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Our primary role is to "leaven the outliers," which means we exercise our authority only in "exceptional cases." *Faith*, 131 N.E.3d at 160. Thus, we generally defer to the trial court's decision, and our goal is to determine whether the defendant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[44] When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as the appropriate sentence for the crime committed. *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014). Here, Hessler was convicted of nineteen Class A felonies. The sentencing range for a Class A felony is between twenty and fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4(a). Hessler received fifty years for each of his Class A felony convictions with some ordered to be served concurrently with each other and others ordered to be served consecutive to each other. This resulted in an aggregate sentence of 650 years executed.

[45] As to the nature of his offense, Hessler acknowledges that the crimes for which he was convicted were heinous but contends that the offenses did not include particularly aggravated brutality. To show his sentence is inappropriate, Hessler must portray the nature of his offense in a positive light, "such as accompanied by restraint, regard, and lack of brutality." *Stephenson*, 29 N.E.3d at 122. Although Hessler argues that his sentence is inappropriate because, during most of the crimes, "the victim was not beaten or wounded beyond the harms inherent in the crimes themselves," Appellant's Br. p. 66, the evidence demonstrated that the injuries suffered by the victim far exceeded the harms inherent in the crime themselves.

[46] In committing this series of crimes over the course of several years, Hessler inflicted severe psychological trauma on the victims by breaking into their homes and then terrorizing them over the course of hours. The ten named victims suffered the injuries inherent in the crimes, and additionally, Hessler

threatened them and their children to coerce their compliance and made threats that he could return in the future, even years later, to kill them. Hessler destroyed the sanctity and security of the victims' homes and made them no longer feel safe. He also engaged in acts that caused severe pain in addition to what the statutes contemplated when he forced the victims to submit to enemas, bound them by hogtying them, hitting L.C. with a belt, and beating R.Y. to the point that he spent four months in a coma and had lifelong injuries. The emotional, psychological, and physical pain inflicted in the victims was well beyond what is contemplated under the nature of the offenses. Further, Hessler asserts that the maximum sentences he received, all running consecutive to each other[9] are far outside the typical range of sentences and are inappropriate. However, we note that, in sentencing Hessler, the trial court made it clear that in pronouncing the sentence, it did not want to choose which crime "was the worst" and "work down from there," which would be "a disservice to any of [the] victims . . . to claim that any of them was better or worse than any of the others." Tr. Vol. 9 p. 213. In crafting the sentence in the manner that it did, the trial court specifically acknowledged each victim and ensured the sentence reflected the harm inflicted to each individual victim. Hessler has not shown that his sentence is inappropriate in light of the nature of the offenses.

---

[9] The trial court did not order all of his sentences to run consecutively. If it had, the total sentence would have been 950 years.

[47]     As to his character, Hessler argues that he had spent the last several decades leading a law-abiding life, and that although the evidence showed that he followed some of the victims on social media and kept items from his crimes, there was no evidence that the victims were aware of this or that he actually contacted any of the victims in the intervening years. "A defendant's criminal history is one relevant factor in analyzing character, the significance of which varies based on the 'gravity, nature, and number of prior offenses in relation to the current offense.'" *Smoots v. State*, 172 N.E.3d 1279, 1290 (Ind. Ct App. 2021) (quoting *Rutherford v. State,* 866 N.E.2d 867, 874 (Ind. Ct. App. 2007)). Even a minor criminal history reflects poorly on a defendant's character for the purposes of sentencing. *Id.*

[48]     Hessler makes no acknowledgement of his criminal history, which consisted of several juvenile adjudications, a misdemeanor theft conviction, and a misdemeanor conviction for harassment. However, the most significant aspect of his criminal history is that he was convicted of Class B felony attempted rape in 1990 for which he was sentenced to twenty years executed. Additionally, the evidence showed that in the intervening years since the instant crimes were committed, Hessler researched some of the victims on his computer and downloaded the information he found, including photographs, current addresses, and the street view of one of the victims' homes. Further, the circumstances of the crimes demonstrate Hessler's disturbing and vile character in that he perpetrated crimes against ten different victims by breaking into their homes and terrorizing, threatening, and sexually assaulting them.

Consequently, we do not believe that Hessler has met his burden to show "substantial virtuous traits or persistent examples of good character" such that his requested reduction of his sentence is warranted based on his character. *Stephenson*, 29 N.E.3d at 122. We, therefore, do not find that his sentence is inappropriate in light of his character.

## Conclusion

[49] In conclusion, we find neither of the preserved instances of alleged misconduct to be prosecutorial misconduct nor do we find the cumulative effect of the instances of alleged misconduct to be fundamental error. We also find that Hessler's argument that four of his burglary convictions violate the common-law elevation rule and constituted double jeopardy is unavailing because *Wadle* overruled the common law double jeopardy rule and applies retroactively. Further, we do not find that Hessler's sentence is inappropriate in light of the nature of the offense and his character.

[50] Affirmed.

Tavitas, J., concurs.

Vaidik, J., concurs in part, dissents in part.

**Vaidik, Judge, concurring in part and dissenting in part.**

[51] I agree with the majority that the alleged prosecutorial misconduct does not require reversal and that Hessler's sentence is not inappropriate. However, I respectfully dissent from the majority's double-jeopardy holding.

[52] Four of Hessler's burglaries were enhanced to Class A felonies because, during those burglaries, he committed sex crimes for which he was separately convicted. Hessler argues, and the State concedes, that under Indiana double-jeopardy law in effect at the time of the crimes such enhancements were impermissible. Specifically, a conviction could not be enhanced based on the same behavior or harm that formed the basis for another conviction. *See, e.g., Bevill v. State*, 472 N.E.2d 1247, 1254 (Ind. 1985) (citing *Bean v. State*, 371 N.E.2d 713, 716 (Ind. 1978)). But the State didn't charge Hessler until more than thirty years after his crimes, on August 18, 2020. That same day, our Supreme Court decided *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), in which it abolished all existing rules for claims of substantive double jeopardy, including the enhancement rule Hessler relies on, and established a new framework for analyzing such claims.

[53] The State contends that *Wadle* controls and that, under *Wadle*, the enhancements are permissible. Hessler does not dispute the latter point but argues *Wadle* should not be applied retroactively. I noted this "potentially sticky issue" in an opinion issued just six weeks after *Wadle*, in an appeal where the

briefs predated *Wadle*. *See Diaz v. State*, 158 N.E.3d 363, 368 (Ind. Ct. App. 2020). Now, for the first time, I am involved in a case where the defendant has raised the retroactivity issue. Having considered the question, I am firmly convinced that Hessler is entitled to the benefit of the double-jeopardy law that was in effect at the time of his crimes.

[54]  In holding that *Wadle* applies, the majority relies on a recent decision by another panel of this Court, *Sorgdrager v. State*, 208 N.E.3d 646 (Ind. Ct. App. 2023), *trans. pending*. The *Sorgdrager* panel held that *Wadle* established "a new constitutional rule of criminal procedure" and therefore applies retroactively to cases that were pending on direct review or not yet final when *Wadle* was decided. *Id.* at 651-52 (citing *Powell v. State*, 574 N.E.2d 331, 333 (Ind. Ct. App. 1991), *trans. denied*). The principle that new procedural rules apply retroactively was first established by the U.S. Supreme Court in *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).[10]

[55]  I believe that, in this case, the *Griffith* retroactivity rule must give way to a different constitutional principle. As our Supreme Court has explained, retroactive application of a judicial decision can violate the ex post facto

---

[10] I have my doubts that the double-jeopardy framework established in *Wadle* is a rule of criminal procedure rather than a rule of substantive law. I acknowledge that our Supreme Court has in the past treated double-jeopardy rules as procedural rules. *See Taylor v. State*, 717 N.E.2d 90, 95 (Ind. 1999). But several years later, the Court explained that a rule is procedural if it addresses the "steps" or "mechanics" of a criminal prosecution, while a rule addressing "the criminal significance of the underlying prohibited conduct" is substantive in nature. *Jacobs v. State*, 835 N.E.2d 485, 489-90 (Ind. 2005). The *Wadle* framework seems to fall in the latter category, since it governs what conviction or convictions are permissible for particular criminal conduct. In any event, the procedural-substantive distinction is not the basis for my dissent.

protections inherent in the due-process clauses of the Fifth and Fourteenth Amendments if the defendant is harmed by the change in law:

> Article I of the United States Constitution provides that neither Congress nor any state may pass any ex post facto law. *See* U.S. Const. art. I, § 9; U.S. Const. art. I, § 10. An ex post facto law is one which applies retroactively to disadvantage an offender's substantial rights. Over two hundred years ago, Justice Samuel Chase explained that "[t]he Legislature may enjoin, permit, forbid, and punish; they may declare new crimes; and establish rules of conduct for all its citizens in future cases; they may command what is right, and prohibit what is wrong; but they cannot change innocence into guilt; or punish innocence as a crime...." *Calder v. Bull*, 3 U.S. 386, 388, 3 Dall. 386, 1 L. Ed. 648 (1798). But, as is clear from the Constitutional text, the Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. **Nonetheless, the prohibition on ex post facto laws embodies one of the most widely held value-judgments in the entire history of human thought, that is, that there should be no punishment without a law authorizing it. This principle— the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. Therefore, the Due Process Clause of the Fifth Amendment, made applicable to the states by the Fourteenth Amendment, protects offenders from judicial decisions that retroactively alter the import of a law to negatively affect the offender's rights without providing fair warning of that alteration.**

*Armstrong v. State*, 848 N.E.2d 1088, 1092-93 (Ind. 2006) (cleaned up and emphasis added). *Armstrong* did not address what happens when *Griffith* collides with this due-process principle, but at least one state supreme court has held that if the due-process principle would be violated by retroactive application of

a judicial decision, *Griffith* retroactivity is impermissible. *State v. Kurzawa*, 509 N.W.2d 712, 716 (Wis. 1994).

[56] *Armstrong* involved a judicial decision interpreting a criminal statute, but the U.S. Supreme Court has made clear that the same ex post facto/due-process analysis applies where, as here, a judicial decision alters a common-law rule of criminal law. *Rogers v. Tennessee*, 532 U.S. 451 (2001). Again, the principle is based on the "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning." *Id.* at 459. A "judicial alteration of a common law doctrine of criminal law" violates the principle of fair warning and must not be given retroactive effect "where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id.* at 462 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)).

[57] The *Rogers* standard is easily met here. Again, the State does not dispute that before Hessler's crimes Indiana Supreme Court precedent dictated that a conviction could not be enhanced based on the same behavior or harm that formed the basis for another conviction. In *Wadle*, the Court reversed course and abandoned that rule (along with all other existing rules for claims of substantive double jeopardy). That development—the Court overruling its prior precedent—was "unexpected and indefensible by reference to the law which had been expressed" before Hessler's crimes. *Rogers*, 532 U.S. at 462. Indeed, the enhancement rule stayed on the books for more than thirty years after Hessler's crimes. The *Wadle* Court acknowledged that its decision amounted to

a seismic shift when it said it was "**charting** a clear path going forward." 151 N.E.3d at 244 (emphases added); *see also id.* at 253 (referring to "our new analytical framework"). Therefore, *Wadle* cannot be applied retroactively to Hessler's crimes. *See Ex Parte Scales*, 853 S.W.2d 586, 588 (Tex. Crim. App. 1993) (holding that retroactive application of judicial decision that abandoned double-jeopardy rule would violate federal due-process clause).

[58] Bottom line, I believe Hessler has a due-process right to the benefit of the enhancement rule that existed at the time he committed his crimes, notwithstanding the fact that our Supreme Court did away with that rule decades later. The four Class A felony burglary convictions he challenges should be reduced to Class B felonies, and he should be re-sentenced accordingly.[11]

---

[11] In cases where the defendant would fare no better under pre-*Wadle* double-jeopardy law, retroactive application of *Wadle* presents no ex post facto/due-process problem. I believe *Sorgdrager* was such a case because, in my view, there was no double jeopardy under pre-*Wadle* law, so the defendant wasn't disadvantaged by the change in law. *See Sorgdrager*, 208 N.E.3d at 649 (detailing separate acts of child molesting). Likewise, the defendant in *Wadle* wasn't disadvantaged by the change in the law because our Supreme Court found double jeopardy using its new test and vacated all but one of the defendant's convictions. 151 N.E.3d at 256. And because there were no ex post facto implications in that case, the Court did not have to address the issue of retroactivity.